Argued and submitted February 18, Valley Catholic High School, Beaverton, affirmed July 5, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# DARREN EUGENE ACKER,
*Appellant.*

## 98-0700; A105629

27 P3d 1071

Stephen A. Houze argued the cause and filed the brief for appellant.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals from his conviction for first-degree sexual abuse. ORS 163.427. He seeks reversal of his conviction and remand for entry of a judgment of conviction for the lesser-included offense of attempted first-degree sexual abuse. He argues that he is constitutionally entitled to an opportunity to enter into a plea agreement for the lesser-included offense because similarly situated defendants in the county where he was convicted received such plea offers. The state responds that the plea negotiation policies followed by the district attorney in the present case are not constitutionally flawed, and that defendant is not entitled to the plea agreement he seeks. We affirm.

Defendant was convicted of first-degree sexual abuse after a stipulated facts trial. In October 1997, defendant's stepdaughter had a friend, R, a 13-year-old girl, spend the night with her at defendant's house. During the afternoon, defendant gave alcoholic beverages to both children. Subsequently, defendant touched R on her breasts and buttocks. Defendant's stepdaughter witnessed the touching. Defendant's stepdaughter reported those events to her mother, who eventually contacted the police. Defendant was charged with two counts of first-degree sexual abuse, ORS 163.427, and furnishing alcohol to a minor, ORS 471.410.

Before trial, defendant's attorney sought on several occasions to negotiate a plea agreement for his client that would have involved defendant pleading guilty to a lesser offense than first-degree sexual abuse. In particular, defense counsel sought to plead to a crime that did not require the imposition of a mandatory minimum sentence under ORS 137.700 (1994) (Ballot Measure 11). The prosecutor declined to offer defendant a plea agreement of the sort he sought. Defendant filed a motion to compel a plea offer, and the court denied that motion after an extensive hearing. The case was then tried on stipulated facts, and defendant was convicted of one count of first-degree sexual abuse and sentenced to the mandatory minimum sentence of 75 months' imprisonment pursuant to Measure 11. Defendant appeals, arguing that the trial court erred in denying his motion to compel a plea offer.

Because of the nature of defendant's challenges, we set forth in detail defendant's arguments and the evidence adduced at the hearing on the motion to compel a plea offer, which concerns the prosecutor's plea negotiations in the present case, as well as the general practices of the Clackamas County District Attorney's Office (DA's office) in negotiating pleas for Measure 11 offenses. Defendant advanced four arguments in support of his motion to compel a plea offer. First, he argued that the prosecutor's failure to extend a plea offer violated ORS 135.405(4), which provides that "[s]imilarly situated defendants should be afforded equal plea agreement opportunities." Second, in failing to extend him a plea offer, the prosecutor unconstitutionally gave controlling weight to the wishes of the victim's family. Third, the DA's office did not have a coherent, systematic policy for the negotiation of Measure 11 offenses, thus violating Article I, section 20, of the Oregon Constitution.[1] Finally, the DA's office used an impermissible criterion—the age of the defendant—in negotiating plea offers in Measure 11 cases.

At the hearing, the trial court heard testimony from many of the prosecutors who tried felony cases in the DA's office. That evidence is discussed in more detail below. After the hearing, the court made extensive findings concerning the plea negotiation practices of the DA's office:

"Number one, I find that the initial policy is that there is no negotiation of Ballot Measure 11 sex cases if the case is provable, taking into consideration the victim's attitude. In this instance, I find that consideration of the victim's attitude goes to the provability of the case.

"Secondly, if there is a desire or a purported need to take a case out of Ballot Measure 11 consequences, the policy requires that the request be made to an Assistant District Attorney. * * *

"In reviewing the case for non-Ballot Measure 11 treatment, the Assistant District Attorney considers the following. Is the case provable? The position of the victim? The availability of the victim, the credibility of the victim, the

_____

[1] Article I, section 20, of the Oregon Constitution, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

age of the victim, the position of law enforcement officers, and is the defendant similarly situated to other defendants?

"Four of those seven criteria, that's availability of the victim, the credibility of the victim, the age of the victim and the position of the law enforcement investigator, I think, are a restatement or simply defining criteria under whether is the case provable.

"Seventh, is the defendant similarly situated to other defendants, must mean more than the same charge as other defendants. So the question becomes, how do you define similarly situated defendants?

"* * * * *

"I find there are two classes of defendants within Ballot Measure 11 cases, sex cases, in the Clackamas County District Attorney's Office that are treated differently than the broad class. One of those classes [is] domestic violence cases[.] * * * The other [is] juvenile cases.

"In determining whether these cases are similarly situated, I find the following distinctions. One, that the domestic violence element is an additional factor and the familiarity in a domestic violence case is an additional factor. And, two, in juvenile—15, 16 and 17 year old—cases, the age of the defendant and the particularly successful programs available only to juveniles in Oregon is an additional nonsimilar distinction.

"In determining application of the policy to cases, I find that the Clackamas County district attorney uses a permissible, subjective analysis of criteria which are traditional evaluations made by trial attorneys, that includes the provability of the case being made by analyzing facts, including but not limited to the strengths or weaknesses of witnesses. * * *[2]

"As to the question whether the district attorney has improperly delegated authority from the district attorney to the victim in making the ultimate decision whether there should be a prosecution, I find that the Clackamas County district attorney has not.

---

[2] The court then noted that there was evidence that one of the prosecutors violated the policy by failing to consult with an assistant district attorney on one occasion, but nonetheless found that the prosecutor articulated reasons for her plea decision that were consistent with the office policies.

"* * * * *

"In this case, I find that the defendant has been treated as similarly situated defendants. I find that the criteria that have been applied are permissible criteria, and I find that they have been consistently applied."

On appeal, defendant makes three arguments that are somewhat interrelated. First, he argues that the trial court erroneously concluded that it was statutorily and constitutionally permissible for the DA's office, in negotiating pleas in cases charged under Measure 11, to treat defendants who were 15, 16 and 17 years of age differently from similarly situated adults. Second, defendant argues that the trial court erred "in holding that a prosecutor may give controlling force to the attitude of the victims concerning plea negotiations." Finally, defendant argues that the trial court erred in its conclusion that the prosecutor's decision on plea negotiation in this case was made pursuant to a coherent policy that was consistently applied. The state responds that the record supports the trial court's conclusions on each of those matters.

We turn to defendant's first argument. Defendant asserts that ORS 137.700 and ORS 137.707[3] mandate that defendants who are 15, 16 and 17 years of age are to be treated in the same manner as adults in the context of Measure 11 offenses. ORS 137.700(1), under which defendant was charged and convicted, provides:

"When a person is convicted of one of the offenses [specified in subsection (2)], the court shall impose, and the person shall serve, at least the entire term of imprisonment listed in subsection (2) of this section. The person is not, during the service of the term of imprisonment, eligible for release on post-prison supervision or any form of temporary leave from custody. The person is not eligible for any reduction in, or based on, the minimum sentence for any reason whatsoever under ORS 421.121 or any other statute. The

---

[3] ORS 137.700, ORS 137.705 and ORS 137.707 collectively are generically known as "Measure 11," an initiated ballot measure from 1994 that mandated minimum sentences for certain crimes and required that people 15, 16 and 17 years of age charged with those crimes be tried in adult court. Those statutes have undergone some changes since their original enactment. Defendant's arguments are based on the current versions of the statutes, and our generic references to "Measure 11" also refer to the current statutes.

court may impose a greater sentence if otherwise permitted by law, but may not impose a lower sentence than the sentence specified in subsection (2) of this section."

ORS 137.707, which applies to 15, 16 and 17-year-old defendants charged with the same crimes listed in subsection (2) of ORS 137.700, provides:

"(1)(a)  Notwithstanding any other provision of law, when a person charged with aggravated murder, as defined in ORS 163.095, or an offense listed in subsection (4)(a) of this section is 15, 16 or 17 years of age at the time the offense is committed, and the offense is committed on or after April 1, 1995, or when a person charged with an offense listed in subsection (4)(b) of this section is 15, 16 or 17 years of age at the time the offense is committed, and the offense is committed on or after October 4, 1997, the person shall be prosecuted as an adult in criminal court.

"(b)  A district attorney, the Attorney General or a juvenile department counselor may not file in juvenile court a petition alleging that a person has committed an act that, if committed by an adult, would constitute aggravated murder or an offense listed in subsection (4) of this section if the person was 15, 16 or 17 years of age at the time the act was committed.

"(2)  When a person charged under this section is convicted of an offense listed in subsection (4) of this section, the court shall impose at least the presumptive term of imprisonment provided for the offense in subsection (4) of this section. The court may impose a greater presumptive term if otherwise permitted by law, but may not impose a lesser term. The person is not, during the service of the term of imprisonment, eligible for release on post-prison supervision or any form of temporary leave from custody. The person is not eligible for any reduction in, or based on, the minimum sentence for any reason under ORS 421.121 or any other provision of law. ORS 138.012, 163.105 and 163.150 apply to sentencing a person prosecuted under this section and convicted of aggravated murder under ORS 163.095 except that a person who was under 18 years of age at the time the offense was committed is not subject to a sentence of death."

ORS 137.705 includes other provisions concerning the prosecution of persons 15, 16 and 17 years of age for

Measure 11 crimes, such as requiring 16 and 17 year olds charged under ORS 137.707 to be detained on the same terms and conditions as adults, but providing that defendants under the age of 16 "may not be detained, either before conviction or after conviction but before execution of the sentence, in a jail or other place where adults are detained." ORS 137.705(3)(c). *See also* ORS 137.124 (concerning when young offenders tried in adult court will be transferred to the physical custody of the Oregon Youth Authority and when they will be retained in the physical custody of the Department of Corrections). ORS 137.705 also defines the term "prosecuted" for purposes of ORS 137.707: " 'Prosecuted' includes pretrial and trial procedures, requirements and limitations provided for in criminal cases." ORS 137.705(1)(a)(B).

██ Defendant argues that the provisions of this statutory scheme, when read together, require a prosecutor to give equal treatment to persons 15, 16 and 17 years of age and to adults in carrying out pretrial procedures, including plea negotiations. In defendant's view, that means that prosecutors may not take into account the age of persons 15, 16 and 17 years of age charged with Measure 11 crimes in determining whether, or how, to negotiate plea bargains. We disagree. The record in this case demonstrates that, as far as actual *procedures*, the DA's office followed the same procedure with cases involving 15, 16 and 17-year old defendants as it did with other defendants charged with Measure 11 offenses. That the prosecutors considered one of the defendant's personal characteristics—age—in the course of plea negotiations does not mean that the "procedures" of plea negotiation were not the same for everyone. Age is a relevant personal characteristic to consider in the course of criminal prosecution, given that certain rehabilitative resources may be available to people of some ages, but not people of other ages. Moreover, the statutory provisions discussed above concerning the detention and incarceration of young offenders charged with or convicted of Measure 11 offenses demonstrate that the legislature did not contemplate that 15, 16 and 17-year old offenders would be treated exactly the same as adult offenders in all circumstances. Although Measure 11 indicates that 15, 16 and 17 year olds must be prosecuted

under the same procedures as older individuals, and, if convicted, receive the same mandatory minimum sentences, it does not dictate that plea bargains must be struck without regard to a defendant's age and without regard to the rehabilitative resources available to young offenders.

■　　Defendant next argues that ORS 135.405(4) prohibits prosecutors from taking into account the age of 15, 16 and 17 year olds charged with Measure 11 crimes when negotiating pleas. That statute provides that "[s]imilarly situated defendants should be afforded equal plea agreement opportunities." Defendant's argument suggests, in essence, that an evaluation of whether defendants are "similarly situated" must be made without reference to the defendant's age. Defendant cites no case for that proposition, and we are aware of none. Rather, ORS 135.405 must be read in conjunction with ORS 135.415, which contains a nonexclusive list of factors that a prosecutor may consider in plea negotiations, and specifically permits prosecutors to take into account whether the defendant has shown willingness to assume responsibility for the conduct involved, and whether a plea bargain would "make possible alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment[.]" ORS 135.415(3). Here, the trial court specifically found—and defendant does not challenge on appeal—that there are "particularly successful programs" that are available only to juveniles in Clackamas County. Given that finding, in this case we need not reach the broader question framed by defendant, *i.e.*, whether age in general, or youthfulness in particular, is a permissible factor for a prosecutor to consider under ORS 135.405 through ORS 135.415. Here, the DA's office's practice of treating defendants who are 15, 16 and 17 years of age in a different manner from older offenders was justifiable under ORS 135.415(3) because it allows 15, 16 and 17-year-old offenders to receive "alternative correctional measures," ORS 135.415(3), through the "particularly successful programs" available in the area.

■ ■　　We turn next to defendant's constitutional arguments. Defendant makes three related constitutional challenges, all based on the provisions of Article I, section 20, of

the Oregon Constitution. Defendant first argues that the DA's office's policy for plea negotiations violates the equal privileges and immunities clause because it allows for disparate treatment of individuals based on an impermissible criterion—the age of the individual. It is undisputed that, for purposes of Article I, section 20, a "district attorney may not decide whether to plea bargain based on impermissible criteria, such as race or religion." *State v. Buchholz,* 309 Or 442, 446, 788 P2d 998 (1990). Defendant does not suggest that age is a *per se* impermissible criterion, such as race or religion. We understand defendant's argument essentially to be that permitting distinctions on the basis of age lacks a rational basis. Given our statutory analysis set forth above, we reject defendant's argument without further discussion.

Defendant further and alternatively argues that his rights under Article I, section 20, were violated because the prosecutor here gave controlling force to the wishes of the victim or the victim's family in determining whether to offer a plea bargain. The trial court found otherwise, indicating that the prosecutor's "consideration of the victim's attitude goes to the provability of the case," but concluding that the prosecutor had not given controlling force to victims in making decisions whether to prosecute under Measure 11. Defendant contends that the trial court erred and that the DA's office's practice of deferring to victims violates Article I, section 20. The state responds that the trial court correctly found that the prosecutor did not give controlling weight to the victims' wishes and further points out that Article I, section 42, of the Oregon Constitution, requires prosecutors to consult with victims before entering into plea agreements.[4] Defendant also advances a distinct but related argument that, even if the DA's office did not systematically give the victim's desires dispositive weight, in this case the prosecutor's decision not to offer a plea was not made pursuant to a coherent policy that was consistently applied. We discuss the "victim's

---

[4] Article I, section 42(1)(f), grants crime victims the following right in criminal prosecutions:

"The right to be consulted, upon request, regarding plea negotiations involving any violent felony[.]"

Article I, section 42(3)(d), defines "violent felony" as including any "felony sexual offense."

desires" and "coherent policy" arguments together, because they both involve examination of the facts adduced at the hearing concerning the practices of the DA's office and its prosecutors in negotiating Measure 11 offenses.

■ We review the trial court's findings in regard to the plea negotiation practices of the DA's office to determine if they are supported by evidence in the record. *State v. McDonnell*, 313 Or 478, 490, 837 P2d 941 (1992) (*McDonnell II*), *citing Ball v. Gladden*, 250 Or 485, 489, 443 P2d 621 (1968). Defendant introduced into evidence records demonstrating that numerous defendants in Clackamas County who had been charged with Measure 11 offenses had entered pleas for lesser, non-Measure 11 offenses. The evidence adduced at the hearing showed that the policy of the DA's office was that deputy district attorneys (DDAs) would negotiate non-Measure 11 pleas in cases in which a defendant had been charged with a Measure 11 offense only after consultation with one of the two supervisors of the felony unit. The supervisors and the DDAs offered extensive testimony regarding the criteria considered in their consultations. The two supervisors of the felony unit testified that the primary criteria considered in deciding whether to negotiate pleas to non-Measure 11 offenses were the provability of the crime and the attitude of the victim. One of the supervisors stated that "if the elements of the offense are provable and the victim is of an attitude that is cooperative and wishes to proceed, then we do not take the case outside Ballot Measure 11." Although various DDAs mentioned other factors such as the magnitude of the crime and the harm to the victim, all essentially agreed with the above-quoted statement that, if the prosecutors believed the case to be provable, it would not be negotiated out of Measure 11 unless such a disposition was in accord with the victim's wishes.

The DDA who tried the present case, Ms. Burcart, also testified about her plea negotiation practices. Burcart specifically discussed the resolution of several cases involving sex crimes in which the defendants were offered non-Measure 11 pleas:

- A middle-aged defendant sexually abused a four-year-old child and was offered a non-Measure 11 plea. Burcart

testified that, although she did not consider the case to have proof problems, she acceded to the wishes of the child's mother, who did not wish the child to testify. Burcart also acknowledged that she had communicated to the defendant's attorney that she did not view the case as a "true Ballot Measure 11 offense" because it only involved the defendant kissing the child and having the child touch his penis.

- A 15-year-old defendant charged with multiple counts of rape and sodomy against two children and was offered a plea to a non-Measure 11 offense. Burcart testified that that case was taken out of Measure 11 based on the defendant's age and proof problems.

- An adult defendant, who was charged with first-degree rape by forcible compulsion against a 17-year-old victim, was permitted to plead to the misdemeanor offense of contributing to the sexual delinquency of a minor. The plea was negotiated in that case because the victim was a runaway and there were allegations that the crime involved prostitution.

- An adult defendant was charged with first-degree sexual abuse of a 92-year-old woman for whom he provided care in a nursing home. Burcart testified that the non-Measure 11 plea offer was made because the initial investigation of the crime was poor, because the victim was not mentally competent and could not be consulted, and because the victim's family had no interest in pursuing the prosecution.

- An elderly defendant was charged with first-degree sexual abuse by forcible compulsion of a 17-year-old victim. Burcart negotiated a plea in that case because she felt that there could be proof problems about the forcible compulsion, and because the victim did not wish to testify.

Burcart did not testify as to her rationale for not tendering a non-Measure 11 plea offer in this case. However, in her capacity as prosecutor, she made numerous representations to the court describing her rationale. Specifically, Burcart indicated that in this case, the victim's family felt strongly that defendant should be prosecuted under Measure 11. She further stated that the victim must always be consulted regarding plea bargaining and added: "For it to come

out of Ballot Measure 11, they [the victims] have to understand what that means and approve of that, as far as I'm concerned." Later, she stated: "I personally don't think I have forced a plea down the throat of a victim or a victim's family. I can't think of one. Maybe I have, but I can't think of a time."

Defendant asserts that the trial court erroneously concluded that, under the DA's office's policy, the "victim's attitude goes to the provability of the case." Defendant does not dispute that the victim's attitude often may bear on provability. However, defendant asserts, the finding is erroneous in that it suggests that the DA's office considers the victim's attitude *only* as a matter of provability. We agree with defendant that the record does not support a determination that, under the DA's office's practices, the victim's attitude went *solely* to provability. Unrebutted evidence in the record here demonstrates that DDAs who believed that their cases had no proof problems nonetheless entered into plea bargains in situations in which the victims were willing to testify but preferred not to go to trial. There is also evidence that those DDAs were acting in a manner consistent with the DA's office's policy in doing so, as reflected by the testimony of one of the supervising attorneys that "if the elements of the offense are provable and the victim is of an attitude that is cooperative *and wishes to proceed*, then we do not take the case outside Ballot Measure 11."

In sum, evidence establishes that the policy of the DA's office is that if a Measure 11 offense is provable, the defendant will be prosecuted under Measure 11, *except* that, in some circumstances, the victim's desires (or the victim's family's desires) may militate in favor of offering a non-Measure 11 plea.[5] Thus, the victim is not able to veto a *plea bargain*. However, in some circumstances, the victim's desire may be dispositive as to whether the DA's office deviates from

---

[5] No evidence was adduced at the hearing that victims were *always* given "veto power" over whether the case that has no perceived problems in proof proceeds as charged under Measure 11. We take judicial notice of the fact that the Clackamas County DA's office does not, in fact, always accede to the victim's wishes that a crime not be prosecuted under Measure 11. *See State v. Thorp*, 166 Or App 564, 2 P3d 903, *rev allowed* 331 Or 598 (2001) (DDA Burcart, notwithstanding the objections of the victim and her family, prosecuted 16-year-old under Measure 11 for having sex with his 13-year-old girlfriend).

its presumption of prosecuting all provable Measure 11 cases. We reiterate: the potential "veto" is not of the plea bargain, but of the Measure 11 prosecution. The question is whether this distinction is constitutionally meaningful. We conclude that this distinction does make a constitutional difference and that the DA's office's practice does not offend Article I, section 20, under the rationale of numerous opinions of the Oregon Supreme Court, most notably, *McDonnell II* and *State v. Farrar*, 309 Or 132, 139, 786 P2d 161, *cert den* 498 US 879 (1990).

In *Farrar*, the defendant challenged the district attorney's decision to charge him with aggravated murder and seek the death penalty, on the ground that several other people had been offered better plea opportunities to better deals. The record showed that the only two other aggravated murder defendants in the county had in fact been offered pleas. The prosecutor explained that, in one of those cases, the defendant was very young, lacked a prior record, and mitigating circumstances existed, and that in the other, the defendant suffered from medical problems that made it unlikely that he would survive until the date that he would be released from prison. By comparison, in *Farrar*, the prosecutor based his decision on considerations that the defendant had a prior record, and an antisocial personality disorder, that there was sufficient evidence to support a death-penalty sanction, and the lack of mitigating circumstances. *Id.* at 137-39. On appeal, the court stated, "we assume that standardless or irrational plea bargaining or a refusal to plea bargain for an improper purpose would be a governmental act within Article I, section 20." The court then set forth the following test:

> "[T]he appropriate inquiry is whether the difference in treatment was merely 'haphazard,' *i.e.*, without any attempt to strive for consistency among similar cases. The district attorney's actions were not based on class discrimination, animus to defendant or his attorney, or concerns collateral to fair prosecution of a defendant for aggravated murder. The district attorney did offer a clear, rational, consistent, and consequently sufficient justification for treating defendant differently from [others charged with similar offenses]." *Id.* at 141.

Similarly, in *Buchholz*, the court found no Article I, section 20, violation where the prosecutor extended a more favorable plea offer to the defendant's accomplice than to the defendant in exchange for the accomplice's testimony against the defendant. The court noted that the accomplice's cooperation was a valid consideration under ORS 135.415, and that the prosecutor's adherence to the standards expressed in that statute represented a "coherent, systematic policy." *Buchholz*, 309 Or at 447, *citing State v. Freeland,* 295 Or 367, 375, 667 P2d 509 (1983).[6]

In *State v. McDonnell*, 310 Or 98, 794 P2d 780 (1990) (*McDonnell I*), the defendant was charged with and convicted of aggravated murder and received the death penalty. 310 Or at 100. Before trial, the prosecutor informed the defendant that "he was willing to enter into a plea agreement with defendant if the victim's parents agreed." *Id.* Under that plea agreement, the defendant would receive a sentence of life imprisonment. Because the plea agreement was not acceptable to the victim's parents, the prosecutor took the case to trial and sought the death penalty. *Id.* On appeal, the defendant asserted that the delegation to the victim's parents of the decision whether to offer a plea agreement violated ORS 135.405 and Article I, section 20, of the Oregon Constitution. The court accepted the state's concession that permitting the victim's parents' wishes to be the controlling factor in the prosecutor's decision did not comport with ORS 135.405 and ORS 135.415. *Id.* at 104-05. The court concluded that where a prosecutor's decision not to enter into a plea agreement "is set aside because it rested wholly on improper considerations, the remedy is for the district attorney to make a new decision based solely on proper criteria and upon the facts that existed when the plea agreement was contemplated." *Id.* at 106. The court therefore remanded the case to the trial court.

■ On remand, the prosecutor indicated that his willingness to extend a plea offer to the defendant "was based

---

[6] *Freeland* concerned the differences between charging crimes by indictment and by information. The court framed the Article I, section 20, question presented in that case as "whether a prosecutor's use of the two charging procedures adheres to sufficiently consistent standards to represent a coherent, systematic policy" that could be administered upon the same terms toward similarly situated defendants. *Freeland,* 295 Or at 375.

solely on [his] concern for the welfare [of the victim's parents]." *McDonnell II*, 313 Or at 487. When asked if he would have proceeded with the death-penalty prosecution if he hadn't taken into consideration the wishes of the victim's parents, the prosecutor responded: "Absolutely." *Id.* at 489. Based on that evidence, the trial court concluded that "the only impact that consideration of the family's preference was going to have *was in defendant's favor.*" *Id.* (emphasis in original). Thus, the court concluded that, absent consideration of the victim's family's wishes, the prosecutor would have considered a number of proper statutory criteria and would not have offered the defendant an opportunity to plead guilty in exchange for a life sentence. *Id.* The defendant also argued that the prosecutor's "no-plea bargaining" policy in capital cases was haphazard, and not part of a coherent and systematic policy. *Id.* at 490-91. The court rejected that argument, noting that a prosecutor "must exercise discretion in a manner that adheres to sufficiently consistent standards to represent a coherent, systematic policy," *id.* at 491, *citing Freeland*, 295 Or at 375, but held that a "no-plea bargain" policy, consistently applied, could satisfy that standard. Thus, under *McDonnell II,* it is clear that a prosecutor may not, based solely on the wishes of a victim, withhold a plea offer that otherwise would have been extended; conversely, it is also implicit in that decision that nothing actually constrains a prosecutor from extending a plea offer that, based on the wishes of the victim, otherwise would not have been extended.[7]

Turning back to the case at hand, the question is whether the DA's office's policy of giving victims "veto" power not of plea bargains, but of the Measure 11 prosecutions themselves, runs afoul of the constitutional principles enunciated in the cases listed above. The answer, we believe, is a qualified "no," under the rationale of *McDonnell II.* Under *McDonnell I,* giving controlling weight to the wishes of the victim or the victim's family in the course of plea negotiation

---

[7] There is something of an analytical anomaly here because, under the facts described in the *McDonnell* cases, the "no plea bargaining" policy actually was not consistently applied, given that the district attorney was willing to depart from it on the basis of the victim's wishes. Nonetheless, we are bound to follow the court's analysis.

is not appropriate. 310 Or at 104-05. However, establishing that the prosecutor gave controlling weight to the victim's wishes does not entitle a defendant to a plea bargain; rather, the question becomes whether the prosecutor would have extended the plea bargain had the victim's wishes not been given controlling weight. *Id.* at 106. As noted, the prosecutor indicated on remand in *McDonnell II* that, had he not taken into account the wishes of the victim's family, he would have proceeded with the death-penalty prosecution in any event. 313 Or at 489.

Thus, the question in this case is not whether the prosecutor improperly gave controlling weight to the victim's family's wishes, but whether a plea offer would have been extended *but for* the prosecutor's consideration of the victim's wishes. In *McDonnell I*, the court remanded for findings on that question. Here, by comparison, the record establishes that the office policy was that, if the victim was cooperative and wished to proceed, and the DDA handling the case did not foresee any proof problems, then the case would proceed under Measure 11. Under that policy, the "default" position is that the prosecution will continue under Measure 11, unless the prosecutor perceives problems in proving the Measure 11 offense, or unless the victim wishes the case to be negotiated out of Measure 11. Only in the event that the victim wishes the case to be negotiated out of Measure 11 will the DA's office consider extending the defendant a plea offer. If the consideration of the victim's wishes is taken out of the equation, then there remains the policy that the prosecutor will proceed with the Measure 11 charge unless there are proof problems with the case. Under *McDonnell II*, and consistently with the reasoning of the other cases discussed above, such a "no-plea bargain" policy satisfies the standards of Article I, section 20.

We acknowledge that the distinction to be drawn between whether the victim is given "veto power" over the plea bargain or "veto power" over whether the prosecution will proceed as charged is subtle, at best. As a practical matter, in both circumstances a prosecutor would ask the victim essentially the same question: "Do you wish to proceed to trial on the offense as charged or would you rather have defendant plead guilty to a lesser offense?" The distinction

lies in what the prosecutor would do if the victim expressed no preference, or if the question had never been asked in the first instance. Under *McDonnell II*, if the prosecutor would have proceeded with the case as charged but for the victim's wishes, there is no constitutional infirmity. The constitutional infirmity apparently arises only if a prosecutor who otherwise would extend a plea bargain to a defendant declines to do so based on the victim's wishes. Here, the policy as enunciated by the DA's office and found by the trial court was that the default position was to prosecute under Measure 11. Under *McDonnell II*, such a policy is not constitutionally infirm regardless of whether the prosecutor erred in giving the victim or her family the opportunity to "opt out" of a Measure 11 prosecution.[8]

There remains the question, however, whether the DA's office policy was applied in a consistent manner. As noted above, the trial court found that the criteria used by the DA's office were permissible and had been consistently applied. Although our conclusions about the precise nature of the policy differ somewhat from the trial court's conclusions, our differences do not call into question the trial court's factual conclusion that the policy has been consistently applied. As noted above, we review the trial court's findings under the permissive standards of *Ball v. Gladden*. *McDonnell II*, 313 Or at 478. Given that standard, we cannot say that the trial court's conclusion that the policy was applied consistently is erroneous.

Affirmed.

---

[8] We recognize that *McDonnell II*'s approach implicitly condones disparate treatment of criminal defendants depending on whether the victims wish for the prosecution to proceed as charged. Those defendants whose victims wish to proceed are not treated as favorably as those whose victims wish the prosecution to be terminated through a plea bargain to a lesser offense. Despite the disparate treatment, a defendant will not be able to prevail on an Article I, section 20 challenge under *McDonnell II* unless he or she can demonstrate that the prosecutor would have offered a plea but for the victim's objections. We note, parenthetically, that the result reached in *McDonnell II* is consonant with the later-enacted Article I, section 42(1)(f), of the Oregon Constitution, which provides that victims have the *right* to be *consulted* in plea negotiation.