Argued and submitted July 13, 2006, affirmed July 11, petition for review denied October 18, 2007 (343 Or 363)

## STATE OF OREGON,
*Respondent,*

*v.*

## CHRISTOPHER CARL NEUBAUER,
*Appellant.*

### 20-03-12155; A124534

162 P3d 1044

John Halpern, Jr., argued the cause and filed the brief for appellant.

Seann C. Colgan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman* and Ortega, Judges.

ORTEGA, J.

---

* Schuman, J., *vice* Ceniceros, S. J.

## ORTEGA, J.

Defendant was convicted of second-degree sexual abuse, ORS 163.425, and now appeals his conviction. We write to address only his argument that the trial court erred by denying his motions for a judgment of acquittal, which were based on a contention that there was insufficient evidence that the victim did not consent to a sexual act; we reject his other assignments of error without discussion. In an appeal arising from the denial of a motion for a judgment of acquittal, we examine the evidence in the light most favorable to the state to determine whether a rational trier of fact could find that the state proved the essential elements of the crime beyond a reasonable doubt. *State v. Stamper*, 197 Or App 413, 416, 106 P3d 172, *rev den*, 339 Or 230 (2005). Because the evidence was sufficient to support the jury's verdict, we affirm.

The jury heard the following evidence. The victim has bipolar disorder, which causes extreme highs or mania, followed by depression. As a result, she entered a psychiatric hospital, where she initially was subject to a "hold" but later was voluntarily admitted. At the time of admission, she was in a manic phase and "entertaining wild ideas that [she] did not normally entertain about reality." She felt confused, physically drained, and emotionally upset.

The hospital provides care for psychiatric patients who may present a danger to themselves or others. They are housed in a self-contained unit attached to a jail, although it is not operated by jail personnel. The hospital is a "secure, lock-down facility." At night, patients are encouraged to stay in their rooms with their doors closed, although their doors are not locked. Hospital staff conduct security checks on patients every 15 minutes through the day and night, looking through windows into patients' rooms and recording each patient's activities. Patients who are out of control can be placed in seclusion.

Defendant was a registered nurse at the hospital and worked the night shift. Generally, one other person, a certified nurses' aide, worked during the night shift, and defendant was in charge.

The victim testified to two incidents of sexual contact between her and defendant early in her stay at the hospital. The first incident occurred one night when she told defendant that she had a backache. He asked her to remove her shirt and gave her a back rub that ended with his touching between her buttocks. Defendant then left the victim's room because the telephone rang.

The second incident occurred on a night when the victim was in a manic phase. She was unable to sleep and asked defendant for something to "get high and have fun." Defendant brought her pills that were not her regular medication, and she took them because she "trust[ed] him * * * [and] felt that he was a friend."[1] After taking the pills, the victim felt herself becoming "very sedated," lethargic, and uninhibited.

Defendant returned to the victim's room while she was under the influence of the medication. It was late at night, and no one else was around. Defendant stood right next to the victim's bed with his penis out of his pants and erect, and she understood from his body language that he wanted oral sex. Although she could not remember at trial whether defendant verbally requested oral sex, she testified that "it was very obvious that's what he wanted * * *." She added, "I don't think he like physically put it in my mouth and put—he didn't like pull my head towards it or anything but it was very obvious that's what he wanted." A police officer who interviewed the victim about two months after the incident, however, testified that she told him then that "she remembers that the defendant 'put his erect penis in her mouth while he was standing in front of her.' "

The victim did not want to engage in the sexual act: "I wouldn't say that I wanted to do it but I didn't actively say no. I felt like he wanted me to do it and I kind of felt like I should, almost kind of like obligated. But I wasn't—I didn't actually say no." The victim testified that she "did consent" but later clarified her meaning with this explanation:

---

[1] The victim's sister knew defendant; as a result, defendant and the victim had met once and had spoken on the phone before the victim's hospitalization.

"I would say it was more like acquiescence in that I—I wasn't—I wasn't verbally saying, yes, I want to do this. Please, please allow me to do this for you or please give me a back rub or anything. I just—I agreed to do it. And I did feel that it was expected and that it was definitely wanted. There wasn't any force obviously involved but it was—

"* * * * *

"But it was—but I could tell that it was wanted and expected and I gave in. And it was kind of like just giving in."

On redirect, the victim agreed that by "acquiescence" she meant "allowing something to happen without protesting or agreeing."

Under the circumstances, the victim concluded "that a nurse could do that." It did not occur to her that there would be rules prohibiting nurses from having sexual contact with patients: "I wasn't thinking along those lines at the time. I just—it was almost as if I was seeing it as just a situation where I was in a room and he wanted that and I kind of felt obligated to do that." The victim testified that, after the incident, she told defendant that she " '[felt] weird about what happened,' " and he responded, " 'That will be our secret.' "

Defendant was charged with sodomy in the first degree (count 1) and sexual abuse in the second degree (count 2), both arising out of the second incident in the hospital.[2] At the close of the state's case-in-chief and again at the conclusion of all the evidence, defendant moved for a judgment of acquittal, and the trial court denied both motions. The jury acquitted defendant of count 1, which alleged that the victim was "incapable of consent by reason of mental defect or mental incapacitation," but convicted defendant of count 2, which alleged that he subjected the victim to deviate sexual intercourse "without her consent."

Defendant appeals, arguing that the trial court erred by denying his motion for a judgment of acquittal. He contends that the evidence was not sufficient to permit a

---

[2] Defendant also was charged with an additional count of second-degree sexual abuse involving a different woman and was acquitted of that charge.

finding that the victim did not consent. According to defendant, "it was not possible to find that she did not consent to the acts in which she engaged, because she was the primary actor and instigator of those acts." In his view, because the victim testified that she did not feel threatened and was not physically forced, "her behavior clearly describes consent." Defendant also contends that the victim's testimony about her state of mind demonstrates that she did, in fact, consent and that acquiescence is a form of consent.

The state responds that the evidence was sufficient for the jury to conclude that defendant propositioned the victim for oral sex and that her performance of that act was not a manifestation of consent under the circumstances. The state further contends that, given the victim's explanation of her state of mind, the jury could reasonably conclude that she did not consent. We agree with the state that the evidence was sufficient for the jury to so conclude.

We begin our analysis with the statutory text. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). ORS 163.425(1) provides, in part, that "[a] person commits the crime of sexual abuse in the second degree when that person subjects another person to * * * deviate sexual intercourse * * * and the victim does not consent thereto." "Deviate sexual intercourse" includes oral sex. ORS 163.305(1). The statute does not define "consent," but ORS 163.315(2) provides that "[a] lack of verbal or physical resistance does not, by itself, constitute consent but may be considered by the trier of fact along with all other relevant evidence."

A common definition of the verb "consent" is "to express a willingness (as to accept a proposition or carry out a particular action) : give assent or approval : AGREE — usu. used with *to* ‹ to shoulder a debt› ‹ to cross-examination› **syn** see ASSENT." *Webster's Third New Int'l Dictionary* 482 (unabridged ed 2002). Citing that definition, we have previously concluded that, "[o]rdinarily, 'to consent' means to give express agreement." *Stamper*, 197 Or App at 417.[3]

---

[3] In *Stamper*, we examined whether the legislature intended the phrase "the victim does not consent thereto" in ORS 163.425 to include a situation in which the victim was legally incapable of consent because of her age. 197 Or App at 415. After

We thus consider whether the evidence was sufficient to allow the jury to conclude that defendant subjected the victim to oral sex and that she did not consent, that is, that she did not express willingness or give assent or approval. We conclude that the jury reasonably could find that the victim did not consent.

The evidence would allow a reasonable jury to find as follows. Defendant entered the victim's hospital room late at night. He nonverbally expressed his desire for oral sex when he, with his pants open and his erect penis exposed, stood right next to the bed where the victim lay sedated. She was ill and isolated in a secure, lock-down facility where he was in a position of power. The victim did not say that she was willing to do what defendant wanted, and she in fact did not want to perform oral sex. Nevertheless, she "gave in" and did as defendant wished because it appeared that she had no choice: "a nurse could do that" and she was "obligated" to comply.

The jury could credit the victim's explanation that, although she did not protest, neither did she agree to perform oral sex; she silently did as defendant obviously wanted because she understood that she was required to do so. Regardless of the victim's use of the words "consent" and "acquiescence" in reference to her actions, the jury could find that her lack of verbal or physical resistance was not consent as that term is used in the statute. Rather, a jury could reasonably determine that the victim, a sedated patient in a

---

a careful review of the statutory text and context, legislative history, prior construction, and subsequent legislative enactments, we concluded that it did. *Id.* at 427.

In our review of the legislative history, we quoted a portion of the Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 105, 106 (July 1971), stating that a lack of consent generally includes instances " 'when the victim does not acquiesce in the actor's conduct.' " *Stamper*, 197 Or App at 421. To "acquiesce" commonly means "to accept or comply tacitly or passively : accept as inevitable or indisputable." *Webster's* at 18. We do not, however, substitute that definition of "acquiesce" for the common definition of the statutory term "consent" so as to conclude that a victim consents when she complies passively with an act that she accepts as inevitable. To do so would result in a judicial insertion of a term that the legislature omitted, contrary to ORS 174.010. Furthermore, such a construction of ORS 163.425 would conflict with the legislature's express statement that "[a] lack of verbal or physical resistance does not, by itself, constitute consent but may be considered by the trier of fact along with all other relevant evidence," ORS 163.315(2).

secured psychiatric facility, simply did not protest when confronted with the apparent demand of defendant, a nurse in a position of power over her; despite her own wishes, the victim allowed defendant to engage in oral sex "without protesting or agreeing."[4]

Alternatively, the jury could have credited the police officer's testimony that, closer in time to the incident, the victim recounted that defendant placed his penis in her mouth. The jury thus could have concluded that defendant physically initiated the sexual act without any expression of willingness on the part of the victim.

Defendant also contends that, if ORS 163.425 prohibits the conduct at issue here, then the statute is facially overbroad and impermissibly vague. We reject that argument without discussion.

Affirmed.

---

[4] Under other circumstances, a defendant might argue that a victim's lack of resistance is pertinent to the issue of whether the defendant had a culpable mental state as to the lack of consent. Here, however, defendant made no argument regarding the sufficiency of the evidence of his mental state.