Argued and submitted November 4, 2008, decisions of Court of Appeals affirmed
in part and reversed in part; judgments of circuit courts affirmed
September 24, 2009

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## VERONICA RODRIGUEZ,
*Petitioner on Review.*

(CC C051244CR; CA A131050; SC S055720)

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## DARRYL ANTHONY BUCK,
*Petitioner on Review.*

(CC 04102314; CA A131973; SC S055721)
(Cases Consolidated for Argument and Opinion)

217 P3d 659

Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioners on review.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Kevin H. Kono and Timothy R. Volpert, Davis Wright Tremaine LLP, Portland, filed a brief and reply brief on behalf of *amici curiae* Boys & Girls Club of Portland and Oregon Education Association.

BALMER, J.

De Muniz, C. J., concurred in part and dissented in part and filed an opinion in which Gillette and Walters, JJ., joined.

## BALMER, J.

These two criminal cases, which we consolidated for argument and disposition, require us to interpret and apply the requirement in Article I, section 16, of the Oregon Constitution that "all penalties shall be proportioned to the offense."[1]

Veronica Rodriguez touched a 13-year-old boy when, standing behind him in a room with 30 to 50 other people, she brought the back of his head into contact with her clothed breasts for about one minute. Darryl Buck touched a 13-year-old girl when the girl, who was sitting next to him while she was fishing, leaned back to cast her fishing line, bringing her clothed buttocks into contact with the back of his hand and Buck failed to move his hand; that happened one or two more times. When they stood up, Buck brushed dirt off the back of the girl's shorts with two swipes of his hand. Each of those touchings was unlawful because a jury in Rodriguez's case and a judge in Buck's case found that they had been for a sexual purpose—a fact that brought the physical contact within the definition of first-degree sexual abuse. ORS 163.427(1)(a)(A). Rodriguez and Buck were both convicted of that crime.

First-degree sexual abuse carries a mandatory sentence of six years and three months (75 months) in prison, under Ballot Measure 11 (1994). In each of these cases, however, the trial judge determined that the mandatory sentence was not "proportioned to the offense" committed by the defendant and therefore was unconstitutional under Article I, section 16. The trial courts imposed shorter sentences—16 months in the case of Rodriguez and 17 months in the case of Buck.[2] The state appealed the trial courts' sentencing rulings, and Rodriguez and Buck cross-appealed their convictions. The Court of Appeals affirmed the convictions, but

---

[1] Article I, section 16, provides:

"Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but *all penalties shall be proportioned to the offense*. In all criminal cases whatever, the jury shall have the right to determine the law, and the facts under the direction of the Court as to the law, and the right of new trial, as in civil cases."

(Emphasis added.)

[2] At oral argument, counsel for defendants indicated that defendants had served those sentences and had been released from prison.

agreed with the state that the trial courts should have imposed mandatory 75-month sentences. *State v. Rodriguez*, 217 Or App 351, 174 P3d 1100 (2007); *State v. Buck*, 217 Or App 363, 174 P3d 1106 (2007).

Defendants filed petitions for review, which we allowed. For the reasons that follow, we affirm defendants' convictions. However, we reverse the decisions of the Court of Appeals as to sentencing and affirm the sentences imposed by the trial courts. We conclude that the imposition of the mandatory 75-month sentence for first-degree sexual abuse, as applied to the facts of Rodriguez's and Buck's offenses, would violate the constitutional requirement that the penalty be proportioned to the offense.

## I. FACTS AND PROCEEDINGS BELOW

We first describe the conduct that led to the convictions at issue here and the proceedings below. We then consider defendants' challenges to their convictions, before turning to defendants' arguments that imposition of Measure 11 sentences in their cases would violate the proportionality requirement of Article I, section 16. We take the facts from the decisions of the Court of Appeals and from the record.

### A. *State v. Rodriguez*

Rodriguez was an employee at the Hillsboro Boys & Girls Club, where she worked with at-risk youth. One of the at-risk youths with whom she worked was a boy who was 12 years old when Rodriguez began working at the club. Rodriguez developed a close relationship with the boy and his family, spending time at his home, helping him with his homework, and giving him rides to the club and to school. She and the boy spent time together outside the club—often alone—in her car, at her apartment, or at his home—all in violation of club rules. Rodriguez told the boy not to tell anyone that they had been alone at her apartment. Rodriguez and the boy often hugged each other and put their arms around each other. The boy sat on her lap in her office and occasionally kissed her on the cheek. Rodriguez sent e-mail messages to the boy in which she called him "babyface" and said, "I love you" and "love you lots." The boy sent Rodriguez similar messages. Rodriguez took the boy with her on several

trips, including overnight trips to visit a former club member and to visit her family. Their conduct had raised concerns among staff members and became the subject of rumors among other children at the club.

The conduct that gave rise to this case occurred on February 14, 2005. Another staff member saw Rodriguez and the boy in the game room at the club, along with 30 to 50 other youths and at least one other staff member. The victim, 13 years old at the time, was sitting in a chair. Rodriguez was "standing behind him, caressing his face and pulling his head back; the back of his head was pressed against her breasts." 217 Or App at 354. The staff member pointed that out to another staff member, who "saw [Rodriguez] run her hands along the victim's face and through his hair while the back of his head was against her breasts." *Id.* The contact lasted approximately one minute.

The staff member reported the incident to a supervisor, and the police were called. Rodriguez was eventually charged with first-degree sexual abuse based on that conduct, and a jury found her guilty.

B. *State v. Buck*

Buck and a friend, Schamp, took a 13-year-old girl and her 15-year-old sister, children of a friend of Schamp's, on a camping trip. Buck previously had told the girls that he thought that they were smart and beautiful; although he knew their ages, he thought that they looked much older. While Schamp and the older girl collected firewood near the campsite, the 13-year-old was fishing off a river bank. Buck sat down next to her and, to keep himself from sliding down the sloped river bank, placed his hands on the rock at his sides. His right hand was on the rock directly behind the victim. When the girl leaned back to cast her fishing line, the top part of her clothed buttocks came into contact with the back of Buck's hand. As the Court of Appeals summarized,

> "The first time it happened, he immediately moved his hand away, but, because the victim did not flinch or react in a way that suggested that she was uncomfortable with the contact, he put his hand back where it was and allowed the contact to occur one or two more times as the victim continued to cast."

*Buck,* 217 Or App at 366. The Court of Appeals described the other contact:

> "While that was occurring, [Buck] slid down the rock a bit. To move himself back to where he was, he put his right hand on the victim's lower back and pushed himself up, using her body for leverage. [Buck] asked the victim whether he made her uncomfortable by touching her. She said that he had and told him that he needed to know what his limits were. He said that he did, apologized, and told her, 'I have nothing but love and affection for you.' When the victim got up to leave, there was dirt on the back of her shorts. [Buck] brushed the dirt off with two swipes of the palm of his hand. The victim walked away and returned to the campsite, where [her sister] and Schamp were."

*Id.* at 366-67.

Buck was charged with first-degree sexual abuse. He waived his right to a jury trial, and the case was tried to the court, which found him guilty.

C. *Sentencing*

Because of the passage of Measure 11 in 1994, the penalty for first-degree sexual abuse is a mandatory sentence of six years and three months (75 months) in prison. ORS 137.700(2)(a)(P).[3] Under that statute, the trial court has no discretion to impose a lesser sentence based on the specific facts of the case, harm to the victim, or characteristics of the defendant. A trial court, however, like this court, has an obligation to consider a claim that a particular sentence is unconstitutional. Here, the two experienced trial judges who heard the cases each ruled that a 75-month sentence for the conduct for which the defendant before them was convicted would violate Article I, section 16.

In *Rodriguez,* Judge Campbell applied the "shock the moral sense" test that this court first set out in *Sustar v.*

---

[3] Measure 11, adopted in 1994 and effective in 1995, provides that the penalty for first-degree sexual abuse is a mandatory prison term of 75 months. Or Laws 1995, ch 2, § 1. As we describe in greater detail below, before the passage of Measure 11, a person convicted of first-degree sexual abuse would have received a guidelines sentence that took into account criminal history and other aggravating or mitigating circumstances. The presumptive guidelines sentence for a defendant with no prior convictions would have been 16 to 18 months in prison.

*County Court for Marion Co.*, 101 Or 657, 201 P 445 (1921)—
the same test that has been followed by this court in subse-
quent cases and that we follow again today. She explained
some of the reasons that she considered the 75-month sen-
tence unconstitutional:

> "I have to first of all take a look at Ms. Rodriguez, who has
> absolutely no prior criminal record of any kind. She's lived
> an exemplary life. * * * [S]he has done a tremendous
> amount for youth in our community and in other
> communities.
>
> "I have to look at the crime itself. This was a touching,
> and as stated apparently by everybody, in a crowded room,
> over clothing, not prolonged. And it's * * * as [the deputy
> district attorney] certainly knows, because he's prosecuted
> many cases in this courtroom, * * * the contact was proba-
> bly the least of any I've ever had.
>
> "* * * I think this is a case that just cries out for shock-
> ing—if the 75-month sentence were imposed—being shock-
> ing to any reasonable person, and I'm not going to impose
> it."

Judge Campbell imposed the sentence that Rodriguez would
have received under the Oregon Sentencing Guidelines, were
it not for the mandatory Measure 11 sentence: 16 months in
prison.

In *Buck*, Judge McCormick was faced with a similar
issue. Although he found that Buck had unlawfully touched
the girl—Buck had waived a jury trial, and the case was tried
to the court—Judge McCormick also said, "I don't think this
should have been charged as a Measure 11 [crime]." The
75-month mandatory sentence, given the particular conduct,
was "grossly unfair." Like Judge Campbell, however, Judge
McCormick did not second-guess the district attorney's deci-
sion to prosecute the case as a Measure 11 offense or the
statutory penalty for that crime. Nonetheless, he proceeded
to determine whether the constitutional proportionality
requirement was met. He too applied the "shock the moral
sense" test and concluded, based in part on his years as a trial
judge, that a 75-month sentence would shock the moral sense
of reasonable people. He based that conclusion on several fac-
tors. As to the reasonableness of the sentence, he pointed out

that Buck "has never been arrested. He has no criminal history whatsoever." He also emphasized that the touching was "outside the clothes, it was without fondling, it was not a situation where it was forced." Judge McCormick also stated, "I would guess that 99.99 percent of the sex abuse cases in the first degree are worse than this." He concluded that the sentence was "so disproportionate as to shock the moral sense of all reasonable persons as to what a right and proper sentence should be." Like Judge Campbell, he applied the sentencing guidelines and concluded that Buck should serve a sentence of 17 months in prison.

### D. *Appeal*

As noted, the state appealed the trial court sentencing decisions, and Rodriguez and Buck appealed their convictions. The Court of Appeals affirmed the convictions without discussion, but reversed the sentences, concluding that the two trial judges had erred in concluding that the Measure 11 sentence violated the proportionality provision of Article I, section 16, and imposing the shorter sentences. In each case, the court held that a 75-month sentence for the conduct in which defendants engaged would not shock the moral sense of all reasonable people and therefore was not unconstitutionally disproportionate. The court remanded the cases for imposition of the mandatory Measure 11 sentence. Defendants petitioned for review, challenging both their convictions and their sentences, and we allowed review. For the reasons that follow, we affirm the convictions, but hold that the Court of Appeals erred in concluding that the sentences were constitutionally permissible. Accordingly, we affirm both the convictions and the sentences imposed by the trial courts.

### II. ANALYSIS—DEFENDANTS' CONVICTIONS

It is important at the outset to distinguish between defendants' claims that the evidence in each case was insufficient to prove sexual abuse and their claims that, even if their convictions are valid, the mandatory 75-month sentences for those convictions are unconstitutional because that penalty is not "proportioned" to their offenses. Rodriguez and Buck both were convicted of first-degree sexual abuse because they "subject[ed] another person to sexual contact"

and the other person was "less than 14 years of age." ORS 163.427(1)(a). For purposes of that statute, "sexual contact" is defined as "any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor *for the purpose of arousing or gratifying the sexual desire* of either party." ORS 163.305(6) (emphasis added). Buck admitted that the physical contact for which he was charged occurred; Rodriguez denied the physical conduct alleged by the state. Both Rodriguez and Buck denied at trial that any physical contact that did occur was for the purpose of "arousing or gratifying * * * sexual desire." On review, defendants argue, as they did in the Court of Appeals, that the evidence was insufficient to prove that the touchings in each case were for any sexual purpose.

■ Defendants face an uphill battle in seeking to overturn a criminal conviction based on the alleged insufficiency of the evidence. We review the jury's verdict to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of first-degree sexual abuse beyond a reasonable doubt. *See State v. King*, 307 Or 332, 339, 768 P2d 391 (1989) (stating standard). And, the same standard applies when, as in Buck's case, the trial judge is the finder of fact. *See State v. Allison*, 325 Or 585, 587-88, 941 P2d 1017 (1997) (applying same standard of review after bench trial).

■ In Rodriguez's case, testimony supported the jury's conclusion that she had acted with a sexual purpose in holding the back of the victim's head against her clothed breasts, while massaging the sides of his head. Although the touching itself did not necessarily demonstrate a sexual purpose, the record discloses a litany of improper communications and conduct between Rodriguez and the boy. A jury reasonably could find that Rodriguez, who was employed to help at-risk youth, such as the boy, acted wrongly in talking and writing to him in a romantic way and that she completely failed to observe the necessary boundaries in what was supposed to be a supportive, professional relationship. Despite the brief, limited nature of the touching, given the other evidence that was introduced at trial, we cannot say that a reasonable jury could not have concluded, beyond a reasonable doubt, that

the touching was for a sexual purpose. Accordingly, we affirm Rodriguez's conviction.[4]

■ Buck similarly argues that the evidence was insufficient to find that the brief physical contact that he had with the victim had been for a sexual purpose. Again, however, although the limited contact for which he was convicted certainly could have occurred without a sexual purpose, the state also introduced other evidence, including evidence of Buck's comments to and apparent thoughts about the girl. Those comments and thoughts suggested that Buck had a sexual and (given the difference in their ages) entirely inappropriate interest in her, and the circumstances were sufficient to permit the factfinder to infer that Buck might have been interested in further sexual contact with her. Thus, there was evidence from which the trial court reasonably could have found that Buck had acted with a sexual purpose when he touched the girl. We therefore affirm Buck's conviction.

### III. ANALYSIS—DEFENDANTS' SENTENCES

That brings us to defendants' argument that, even if their convictions are sustained, to sentence them to a mandatory prison term of six years and three months for the conduct described above violates the proportionality requirement of Article I, section 16. We therefore put to one side the issue on which the dissent focuses—whether the legislature (or the people, exercising their legislative power through the initiative process) may protect children by imposing criminal penalties on the kinds of touching that Rodriguez and Buck

---

[4] The brief of *amici curiae* Boys & Girls Club of Portland and Oregon Education Association argues that permitting a jury to infer sexual intent from conduct that may be entirely nonsexual is inconsistent with our prior cases. *Amici* maintain that permitting such inferences subjects those who work with children to the constant threat that an unhappy coworker may report them for sex abuse—as apparently happened in *Rodriguez*—leading to a criminal investigation and possible trial and conviction. *Amici* point out that the *conduct* of a female teacher or mentor hugging a child occurs hundreds of times a day and that "[clothed] breasts almost inevitably contact the other person." Even if that is true, however, it does not aid Rodriguez here, because, as discussed in the text, there was other evidence in addition to the circumstances of the touching itself that, together with the evidence of the touching, was sufficient to permit the jury to draw the inference that the contact was for a sexual purpose. To the extent *amici* believe that current laws permit sex abuse to be charged too easily, they should take that issue up with the legislature.

engaged in. Of course they can. The question instead is whether there is any constitutional limit on the term of imprisonment that can be imposed for the touchings that occurred here. In our view, Article I, section 16, does impose a limit.

In analyzing whether the imposition of a 75-month sentence is unconstitutionally disproportionate, we focus on the unlawful conduct in which Rodriguez and Buck engaged. Defendants were convicted because the finder of fact determined that, with a sexual purpose, they engaged in the touching described above: Rodriguez brought the back of the boy's head in contact with her clothed breasts, in a room of 30 to 50 other people, for about a minute; Buck failed to move his hand to eliminate the contact between the back of his hand and the girl's clothed buttocks that occurred when she leaned back to cast her fishing line and, a few moments later, he brushed dirt off the back of her shorts. Our task is to decide whether the mandatory 75-month sentence is an unconstitutionally disproportionate penalty for the conduct that occurred in these cases.

A. *Legal Standard*

In this court's first case articulating a standard for applying Article I, section 16, the court held that, "[i]n order to justify the court in declaring punishment cruel and unusual with reference to its duration, the punishment must be so proportioned to the offense committed as to *shock the moral sense of all reasonable men as to what is right and proper under the circumstances.*" *Sustar*, 101 Or at 665 (emphasis added). Although the decision in *Sustar* referred to the cruel and unusual punishment clause of Article I, section 16, rather than the proportionality clause, in later cases this court has made it clear that the "shock the moral sense" standard also applies to proportionality challenges. *See State v. Wheeler*, 343 Or 652, 175 P3d 438 (2007) (applying "shock the moral sense" standard to claim that sentence was not proportioned to the offense).

In *Wheeler*, this court also refined the *Sustar* test, noting that the "shock the moral sense of all reasonable people as to what is right and proper" test was not intended to be taken literally—"that is, that a penalty for a particular crime

would meet the proportionality requirement if a single 'reasonable person' could be found whose moral sense was not 'shocked' by that penalty." 343 Or at 670. Rather, as stated in *Wheeler*, the court in *Sustar* was attempting to articulate a standard that would "find a penalty to be disproportionately severe for a particular offense only in rare circumstances." *Id.* (footnote omitted). The court also reaffirmed in *Wheeler* the central role that the legislature plays in establishing penalties for crimes. *Id.* at 671. It is not the role of this court to second-guess the legislature's determination of the penalty or range of penalties for a crime. However, it is the role of the court to ensure that sentences conform to requirements that have been in our constitution for 150 years. And, when we conclude that, because of its length, a sentence is inconsistent with Article I, section 16, as we have on at least three occasions, we should hold that sentence unconstitutional.[5]

■ The difficult question posed here, then, is whether the mandatory 75-month sentence that Measure 11 would impose in each of these cases is so disproportionately severe that it constitutes one of those "rare circumstances" that requires reversal under Article I, section 16. In declaring unconstitutional a punishment that is so disproportionate, when compared to the offense, so as to "shock the moral sense" of reasonable people, this court has identified at least three factors that bear upon that ultimate conclusion: (1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant.[6]

---

[5] As we discussed in *Wheeler*, this court held sentences unconstitutionally disproportionate in *State v. Shumway*, 291 Or 153, 630 P2d 796 (1981), and *Cannon v. Gladden*, 203 Or 629, 281 P2d 233 (1955). The Court of Appeals, following *Shumway* and *Cannon*, also held a sentence unconstitutionally disproportionate in *State v. McLain*, 158 Or App 419, 974 P2d 727 (1999). Additionally, this court struck down a sentence as unconstitutionally excessive in *State v. Ross*, 55 Or 450, 104 P 596, *on reh'g*, 106 P 1022 (1910), *appeal dismissed*, 227 US 150, 33 S Ct 220, 57 L Ed 458 (1913). In *Ross*, the court based its decision on the prohibition on "cruel and unusual punishment," but did not indicate whether it was relying on the federal or state constitution.

[6] Other courts have considered the factors identified above, among others, in deciding proportionality challenges under cruel and unusual punishment provisions. *See Solem v. Helm*, 463 US 277, 292, 103 S Ct 3001, 77 L Ed 2d 637 (1983) (Eighth Amendment proportionality includes consideration of "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the

We turn to an examination of each of the factors and then apply those factors.

1. *The Relationship between the "Penalty" and the "Offense"*

■■ In *Wheeler*, this court examined the text of Article I, section 16, and attempted to articulate what the framers of that provision meant when they required that a penalty should be "proportioned" to the offense:

> "The term 'proportion' indicates a comparative relationship between at least two things. *See, e.g.*, 2 Noah Webster, *An American Dictionary of the English Language* 45 (1828) ('proportion' indicates a 'comparative relation'). Here, the two things being related are 'penalties' and 'the offense,' and the provision requires that the penalties for each particular offense be 'proportioned'—that is, comparatively related—to that offense. *The strong implication of that requirement is that a greater or more severe penalty should be imposed for a greater or more severe offense, and, conversely, that a less severe penalty should be imposed for a less severe offense.*"

343 Or at 655-56 (emphasis added). After an extensive discussion of the history of the proportionality requirement, the court in *Wheeler* applied it to the sentences at issue there, concluding that "[the] defendant's sentences bear a sufficient relationship to the gravity of the crimes of which he was convicted and his prior felony convictions." 343 Or at 680. Thus, it is apparent from *Wheeler* that application of the proportionality provision requires consideration of the relationship between the "gravity" of the offense and the severity of the penalty. That consideration is similar to the first step in the test used by the United States Supreme Court in determining whether a penalty constitutes "cruel and unusual punishment" for purposes of the Eighth Amendment. *See Solem v. Helm*, 463 US 277, 292, 103 S Ct 3001, 77 L Ed 2d 637 (1983)

---

same crime in other jurisdictions"); *People v. Leonard*, 40 Cal 4th 1370, 1426-27, 157 P3d 973, 1014-15 (2007) (proportionality aspect of state "cruel or unusual punishment" provision requires consideration of circumstances of offense, extent of defendant's involvement, consequences of offense, and personal characteristics of defendant). However, the three factors set out above—all of which have been discussed in this court's precedents—provide a sufficient basis to decide the present cases.

(first part of test is examining the "gravity of the offense and the harshness of the penalty").[7] It also was the first step that the Court of Appeals followed in these cases, which that court applied based on its own precedents and *Solem. Rodriguez*, 217 Or App at 360-62; *Buck*, 217 Or App at 370 n 6.

■ These cases require us to elaborate on the way in which a court should examine the severity of the penalty, the gravity of the offense, and the relationship between the two. As to the relevant penalty, in contemporary criminal justice systems, including Oregon's, the primary determinant of the severity of a penalty is the amount of time that the wrongdoer must spend in prison or jail, if convicted of that offense.

■ Examining the "offense" is slightly more involved. The state argues that the "offense," for purposes of the proportionality requirement, is limited to the description of the prohibited conduct in the statute. In the state's view, the court is not permitted to consider the specific facts of any individual case when analyzing the gravity of the "offense."

The state's approach is inconsistent with this court's prior cases and defines "offense" too narrowly. If the state were correct, and the court could look to only the statutory definition of the "offense" and compare it to the statutory penalty, a defendant essentially would be limited to challenging the proportionality of a criminal penalty on its face. Of course, this court has rejected facial challenges to the mandatory sentences imposed by Measure 11, *State ex rel Huddleston v. Sawyer*, 324 Or 597, 614, 932 P2d 1145 (1997), and we do not question that decision. However, in rejecting facial challenges to Measure 11 penalties, this court explicitly stated that a defendant could assert an as-applied

---

[7] A comparison of the gravity of the offense with the severity of the penalty is still an appropriate consideration for purposes of determining whether a given sentence violates the Eighth Amendment to the United States Constitution. *See Harmelin v. Michigan*, 501 US 957, 111 S Ct 2680, 115 L Ed 2d 836 (1991) (seven Justices agreeing that a comparison of the gravity of the offense and severity of the penalty is appropriate). However, it is unclear whether a majority of the Court would continue to apply the other two *Solem* factors—the sentences imposed on other criminals in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions—in all Eighth Amendment cases. As noted below, we nonetheless find the *Solem* framework a useful example of how courts approach proportionality challenges.

constitutional challenge, as defendants have here: "[I]f a sentencing court rules that a statutorily prescribed sentence (under [Measure 11] or any other statute) would be unconstitutionally cruel and unusual *as applied in a given case*, the court may refuse to impose the prescribed sentence." *Id.* (emphasis in original). And an as-applied challenge necessarily involves the consideration of the particular conduct in which the defendant engaged and for which he was convicted, as well as other factors, such as the defendant's criminal history. *See, e.g., Wheeler*, 343 Or at 677-80 (in rejecting facial and as-applied proportionality challenges to sentence for sexual abuse, noting that defendant was charged with 18 separate sex felonies involving three different boys as young as nine years of age and that he had two previous felony sex convictions as well as a robbery conviction).

An as-applied proportionality analysis that considers the facts of an individual defendant's specific criminal conduct is particularly significant when the criminal statute at issue covers a broad range of activity, criminalizing a variety of forms and intensity of conduct. In such a case, a harsh penalty might not, on its face, be disproportionate, because of the fact that the statute dealt, *inter alia*, with some extreme form of that conduct. However, when a defendant is convicted for engaging in only more minor conduct encompassed within the statute, the defendant may plausibly argue that the mandatory sentence, as applied to the particular facts of his or her case, is unconstitutionally disproportionate. To refuse even to consider defendants' as-applied challenge would not only be inconsistent with *Huddleston*, but would undermine the basic proportionality concept that more serious crimes should receive more severe sentences than less serious crimes and vice versa.

In any event, the state offers no cogent reason to read the word "offense" in Article I, section 16, as limited to only the general (and, therefore, abstract) description of the conduct prohibited in the statute. Certainly, "offense," for purposes of the proportionality requirement, *includes* the statutory definition of the crime, but the ordinary definition of the word "offense" also includes the specific conduct of the

defendant that (because it was within the statutory definition) led to the prosecution and conviction of that defendant.[8] We therefore conclude that a defendant's "offense," for purposes of Article I, section 16, is the specific defendant's particular conduct toward the victim that constituted the crime, as well as the general definition of the crime in the statute. In considering a defendant's claim that a penalty is constitutionally disproportionate as applied to that defendant, then, a court may consider, among other things, the specific circumstances and facts of the defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim.

Having identified the "penalty" and the "offense," Article I, section 16, requires a court then to consider whether the former is "proportioned" to the latter. As discussed above, we observed in *Wheeler* that the use of the word "proportioned" strongly implies "that a greater or more severe penalty should be imposed for a greater or more severe offense, and conversely, that a less severe penalty should be imposed for a less severe offense." 343 Or at 656. The state argues that, by enacting a statute that sets a more severe penalty, the legislature (or the people acting through the initiative process) establishes that the offense to which the penalty is attached is, necessarily, a more severe offense. That is true, to a point. But this court has an independent duty to consider whether the specific sentences imposed pursuant to that statute are consistent with the constitutional proportionality requirement of Article I, section 16. Indeed, in *Huddleston*, we recognized that a court's authority to hold a Measure 11 sentence unconstitutional if, based on the facts of the particular case, the sentence violated Article I, section 16, was essential if the judicial branch were to retain its appropriate constitutional role. 324 Or at 614.

---

[8] In 1823, Webster's *An American Dictionary of the English Language* included, as one of several definitions of "offense:" "3. Any transgression of law, divine or human; a crime; sin; act of wickedness or omission of duty." That definition, of course, does not tell us whether the framers intended "offense" to include consideration of a particular defendant's conduct or only of the crime as defined in general terms in the statute, but it does indicate that the former meaning can be encompassed within the term.

We acknowledge that the task of comparing the penalty to the offense involves judgments that courts find difficult, but it is not impossible. The United States Supreme Court addressed the issue of the court's role in making such determinations in *Solem:*

"Application of these factors assumes that courts are competent to judge the gravity of an offense, at least on a relative scale. In a broad sense, this assumption is justified, and courts traditionally have made these judgments—just as legislatures must make them in the first instance. Comparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender. * * * [T]here are widely shared views as to the relative seriousness of crimes. For example, as the criminal laws make clear, nonviolent crimes are less serious than crimes marked by violence or the threat of violence.

"There are other accepted principles that courts may apply in measuring the harm caused or threatened to the victim or society. The absolute magnitude of the crime may be relevant. Stealing a million dollars is viewed as more serious than stealing a hundred dollars—a point recognized in statutes distinguishing petty theft from grand theft. Few would dispute that a lesser included offense should not be punished more severely than the greater offense. Thus a court is justified in viewing assault with intent to murder as more serious than simple assault."

463 US at 292-93 (citations omitted).

### 2. *Comparison of Penalties Imposed for Related Crimes*

In determining whether a penalty is "proportioned" to the offense, it also is helpful to examine the penalties imposed for other, related crimes. If the penalties for more "serious" crimes than the crime at issue result in less severe sentences, that is an indication that the challenged penalty may be disproportionate.

Indeed, two of the three cases in which this court has overturned criminal penalties as disproportionate—*State v. Shumway*, 291 Or 153, 630 P2d 796 (1981), and *Cannon v. Gladden*, 203 Or 629, 281 P2d 233 (1955)—involved just such a comparison between the penalties for two different crimes. Although both cases involved the unusual circumstance that

one crime was a lesser-included offense of the other crime, this court in both cases rejected the argument that the state makes here—that it is inappropriate, as part of proportionality review, to consider the particular penalties that the legislature has imposed for other crimes. *Shumway*, 291 Or at 163-64; *Cannon*, 203 Or at 632-33. In *Cannon*, for example, this court struck down a penalty for assault with intent to commit rape (either statutory rape or forcible rape) that was greater than the penalty for a completed rape (either statutory or forcible). The penalty for assault with intent to commit rape was life in prison, while the penalty for a completed rape was a prison term of not more than 20 years. This court held the penalty for assault with intent to commit rape unconstitutional, despite the fact that a legislature reasonably might choose to impose a greater penalty for a brutal assault with the intent to commit a forcible rape than for a nonforcible statutory rape. 203 Or at 632-33. Thus, notwithstanding the special circumstances of the lesser-included offense example, the fact remains that this court *has* considered the penalties imposed for crimes other than the crime of conviction when it has ruled on proportionality challenges. Other courts considering proportionality challenges often compare the penalty for the crime at issue to penalties for other crimes. *See, e.g.*, *Solem*, 463 US at 298 (considering sentences imposed for other crimes in same jurisdiction); *State v. Dayutis*, 127 NH 101, 104-06, 498 A2d 325, 328-29 (1985) (same).

That is not to suggest that a court may roam freely through the criminal code, deciding which crimes are more or less serious than others. We have emphasized the legislature's central role in determining which crimes are more or less serious, *Wheeler*, 343 Or at 671-73, and, reflecting changing societal norms, the legislature may decide that certain crimes should henceforth be considered more serious and subject to more severe penalties than other crimes that previously had been considered more serious. *State v. Ferman-Velasco*, 333 Or 422, 431, 41 P3d 404 (2002). However, nothing in the concept of proportionality in criminal sentencing suggests that the only "proportion" that should be considered is the relationship between the crime for which the defendant was convicted and the punishment for that crime. Indeed, a

standard that considers the offense and the penalty at issue in the context of related offenses and penalties provides a closer connection to the manner in which the substantive criminal laws and the sentencing statutes work together—and to what would, or would not, "shock the moral sense" of reasonable people—than the purely abstract comparison of any single offense and the penalty for that offense. Our effort to determine whether a particular penalty is proportioned to a particular offense would be wholly divorced from social and legal reality if we were to refuse to consider the penalties imposed for other crimes that have similar characteristics to the crime at issue.

For those reasons, in determining whether the penalties imposed for the crimes charged in these cases are proportional or not, we also consider the penalties imposed for related crimes. Certainly, as noted above, a court would have difficulty comparing the relative seriousness or gravity of, say, forcible rape and first-degree robbery, or identity theft and harassment—but that is unnecessary here. Oregon has an elaborate listing of sex offenses, *see* ORS 163.305 to 163.479, and comparing the conduct constituting the crime and the penalty here to other sex crimes is useful in determining whether the penalty is proportioned to the offense.[9]

### 3. *Criminal History and Recidivism*

A third factor that this court often has considered in proportionality cases is the defendant's criminal history. The idea that a penalty that might be proportional as applied to one who has previously committed the same or other crimes but not proportional as applied to a first-time offender is

---

[9] The dissent argues that "the only relevant factor" in applying Article I, section 16, is the relationship between the particular crime and the penalty for that crime, and it rejects any consideration of the penalties for related crimes. 347 Or at 87, 90 (De Muniz, C. J., concurring in part and dissenting in part). The dissent is incorrect. As this court stated in *Wheeler*, the concept of proportionality implies that the "strong implication" of the proportionality requirement "is that a greater or more severe penalty should be imposed for a greater or more severe offense, and, conversely, that a less severe penalty should be imposed for a less severe offense." 343 Or at 655-56. Applying the proportionality requirement thus necessarily involves at least some consideration of crimes other than the crime of conviction. And, as discussed in the text, in both *Shumway* and *Cannon*, this court considered crimes in addition to the crimes of conviction in holding the sentences in those cases unconstitutionally disproportionate.

rooted in Blackstone's influential writings on proportionality. Blackstone, who urged more rational, proportional sentences, argued that different standards should apply to repeat offenders. 4 William Blackstone, *Commentaries on the Laws of England* 12, 15-16 (1769).

This court emphasized the importance of a defendant's criminal history 80 years ago when it considered a proportionality challenge in *State v. Smith*, 128 Or 515, 273 P 323 (1929). The defendant had challenged as disproportionate a life sentence that he had received under a habitual-offender statute. He had been convicted of receiving stolen goods, and, because he had been convicted of three prior felonies, he came within the terms of the recidivism statute and was sentenced to life in prison. The court observed that the state has an interest in preventing repeat offenders from engaging in further crimes and stated that "it does no violence to any constitutional [guarantee] for the state to rid itself of depravity *when its efforts to reform have failed.*" 128 Or at 525 (quoting *State v. Le Pitre*, 54 Wash 166, 168, 103 P 27, 28 (1909) (emphasis added; internal quotation marks omitted)). The court in *Smith* went on to say:

> "The defendant in the instant case had previously been convicted of burglary, but the offense for which he was sentenced to life imprisonment * * * was a lesser crime, the crime of receiving stolen property. Were we to consider this penalty with reference to the defendant's latest offense alone, we would be astounded at its severity. But a careful analysis of the entire record clearly indicates that the defendant is an incorrigible criminal, a man who has heretofore been convicted at least four times for burglariously preying upon the property and safety of others. Add to this fact that, throughout the history of criminal law, burglary has been looked upon as a crime of great magnitude, and the burglar as a dangerous and desperate criminal, and the sentence imposed in this case can be deemed a just one."

128 Or at 525-26. As we said of *Smith* in the recent decision in *Wheeler*, that case "emphasized that the [proportionality] analysis must focus not only on the latest crime and its penalty, but on the defendant's criminal history." 343 Or at 673.

This court similarly relied upon the defendant's criminal history in rejecting Article I, section 16, and other

constitutional challenges to an indeterminate life sentence for a sex offender in *Jensen v. Gladden*, 231 Or 141, 372 P2d 183 (1962). The statute in that case permitted a life sentence only if the defendant had prior convictions for sex crimes, and the court stated that determining whether the sentence would "shock the moral sense" would "depend upon the seriousness of *repetitive sexual conduct of this kind* and the danger that it forecasts for others unless the defendant is segregated from society." *Id.* at 144-45 (emphasis added). Acknowledging what it described as the dimly understood subject of sex crimes and recidivism, *id.* at 145, the court upheld the sentence.

Reviewing those and other cases, this court in *Wheeler* explicitly agreed that a penalty that might be proportional for a repeat offender—in *Wheeler*, the defendant, who was sentenced to life in prison for multiple felony sex offenses, had two prior felony sex convictions—would not necessarily be proportional for a first-time offender. *Wheeler*, 343 Or at 671 ("[T]he proportionality provision permits the imposition of penalties for repeat offenders that might not be permissible for a single offense."). This court's cases firmly establish that a defendant's criminal history—including, necessarily, a defendant's lack of any criminal history—is relevant in determining whether a particular penalty is "proportioned" to the defendant's offense.[10]

## B. *Consideration of the Factors*

### 1. *The Penalty and the Offense*

■■ We next apply the proportionality provision of Article I, section 16, to the cases before us by considering the factors described above. The first factor identified above is the comparison of the "penalty" and the "offense."

Defendants were convicted of first-degree sexual abuse. The crimes of first- and second-degree sexual abuse

---

[10] The dissent rejects any consideration of a defendant's criminal history in deciding whether a penalty is unconstitutionally disproportionate as applied to that defendant. 347 Or at 91 (De Muniz, C. J., concurring in part and dissenting in part). Again, however, the dissent's position is inconsistent with this court's cases. *See Smith*, 128 Or at 525-26, and *Wheeler*, 343 Or at 673 (both considering defendants' criminal history in deciding whether penalty met proportionality requirement).

originally were enacted as part of the 1971 revision of the criminal code. *Former* ORS 163.425 (1971) (first-degree sexual abuse); *former* ORS 163.415 (1971) (second-degree sexual abuse). First-degree sexual abuse was defined (among other things) as sexual contact with a person less than 12 years of age. Under versions of those statutes that were in effect from 1971 until 1991, the conduct at issue here would have constituted second-degree sexual abuse, which was a Class A misdemeanor subject to a maximum sentence of one year in jail. *See former* ORS 163.415 (1971) (defining second-degree sexual abuse and classifying crime as Class A misdemeanor); *former* ORS 161.615(1) (1971) (setting maximum penalty for Class A misdemeanor of one year in jail). First-degree sexual abuse required that the defendant use forcible compulsion or that the victim be under 12 years old; it was a Class C felony. *Former* ORS 163.425 (1971). In 1991, the legislature expanded the scope of first-degree sexual abuse to include sexual contact with a person under the age of 14. Or Laws 1991, ch 830, § 3. The legislature also reclassified the offense as a Class B felony. *Id.* From 1991 until the effective date of Measure 11 in 1995, the presumptive sentence for first-degree sexual abuse under the sentencing guidelines was 16-18 months in prison. Even that presumptive sentence would have been subject to a possible "downward departure" if the court found certain mitigating factors.

With the passage of Measure 11, the penalty for first-degree sexual abuse was set as a mandatory term of 75 months in prison. ORS 137.700(2)(a)(P). The penalty for a first-time offender, like defendants here, cannot be increased or decreased.[11] The "penalty," for purposes of the proportionality analysis, is the mandatory prison sentence of 75 months.

As discussed above, the "offense," for purposes of an as-applied proportionality challenge, consists of both the

---

[11] The legislature in 2001 enacted a limited exception to the mandatory 75-month penalty for first-degree sexual abuse by permitting the trial court to make a downward departure from that sentence in certain limited circumstances. *See* ORS 137.712(2)(e) (providing exception). That exception is not available to defendants here because they were more than five years older than the victims at the time of the offense. The limitations on a trial court's authority to increase a Measure 11 sentence are discussed below, 347 Or at 72-73.

statutory definition of the crime and the circumstances of the particular crime that led to the defendant's conviction. That approach is particularly appropriate here. The statutory definition consists of the terms of the conduct prohibited by the first-degree sexual abuse statute, ORS 163.427(1), and few statutes criminalize such a broad range of conduct.[12] Measure 11 groups all acts constituting first-degree sexual abuse together and subjects all acts that fall within the definition of that crime to the same sentence. As defendants point out, ORS 163.427(1) covers

> "[a] wide swath of conduct when the victim is less than 14 years, including, but not limited to, momentary touching of an intimate part without the victim's awareness or knowledge, touching that the victim apprehends but does not appreciate as sexual, momentary touching over clothing, prolonged hand to genital contact, prolonged skin to skin genital contact, and, of course, forcing a person under 18 to engage in bestiality."

Measure 11 imposes the *same, mandatory* prison term for a 50-year-old man forcing a 13-year-old girl to engage in prolonged skin-to-skin genital contact with him and a 19-year-old forcing the same 13-year-old to touch his clothed buttock for five seconds. Because the statutory wording—"any touching of the sexual or other intimate parts of a person [under 14 years of age] * * * for the purpose of arousing or gratifying the sexual desire of either party"—encompasses (for example) the former conduct, the mandatory 75-month sentence for first-degree sexual abuse does not, on its face, violate Article I, section 16. But because the statute *also* encompasses conduct that reasonable people would consider far less harmful, defendants are entitled, as this court held in *Huddleston*, to argue that the mandatory sentence, as

---

[12] As set out above, that statute prohibits "subject[ing] another person to sexual contact" when the other person is less than 14 years of age. ORS 163.427(1). "Sexual contact," for purposes of that statute, consists of "any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6). The phrase "sexual or other intimate parts" is not defined in statute, and this court has stated that the phrase includes genitals and breasts, as well as parts that are "subjectively intimate to the person touched, and either known by the accused to be so or to be an area of the anatomy that would be objectively known to be intimate by any reasonable person." *State v. Woodley*, 306 Or 458, 463, 760 P2d 884 (1988).

applied to the particular facts of their cases, is unconstitutionally disproportionate.[13]

Thus, the "offense" at issue here includes the specific conduct in which each defendant engaged. That conduct consisted of Rodriguez causing the back of the boy's head to be in contact with her clothed breasts for about a minute and of Buck letting the back of his hand remain when the girl leaned her clothed buttocks against his hand several times and later wiping dirt off the back of her shorts with two swipes of his hand. In each case, defendant's contact came within the scope of first-degree sexual abuse, because it was the "touching of the sexual or other intimate parts of a person" under the age of 14 for the "purpose of arousing or gratifying the sexual desire of either party." *See* ORS 163.305(6) (defining "sexual contact").

In determining whether the penalty here is unconstitutionally disproportionate, we cannot ignore the limited extent of the offenses—the physical touching—at issue here. There is no evidence that any touching between Rodriguez and the boy involved fondling, stroking, rubbing, or palpating. And the trial court, sitting as the factfinder in *Buck*, found that his contact with the girl did not involve fondling and was "minimal." The touchings were brief, if not momentary. There is no evidence of force or threats of any kind. The "sexual" or "intimate" body parts that were touched were clothed. There was no skin-to-skin contact, no genital contact, no penetration, no bodily injury or physical harm.[14] In

---

[13] The state argues that, because the voters approved Measure 11, a majority of Oregon citizens view a 75-month sentence as presumptively " 'right and proper' for first-degree sexual abuse, in any of its forms," including for the conduct at issue here. The state simply is incorrect, as a factual matter. It is certainly true that the passage of Measure 11 demonstrated support for specific sentences, including for first-degree sexual abuse. Voters, however, expressed no opinion as to the imposition of a specific sentence in any particular factual circumstances, much less that any sentence imposed under Measure 11 should be exempt from the usual process of judicial review to determine compliance with constitutional limitations. Had the people of Oregon wished to do so, they could have expressly exempted Measure 11 from the proportionality requirement of Article I, section 16, by amending the Oregon Constitution, as they did when they amended the constitution to permit the death penalty for aggravated murder. *See* Or Const, Art I, § 40 ("*Notwithstanding sections 15 and 16 of this Article*, the penalty for aggravated murder as defined by law shall be death upon unanimous affirmative jury findings as provided by law and otherwise shall be life imprisonment with minimum sentence as provided by law." (Emphasis added.)).

[14] We do not suggest that defendants' conduct caused no harm to their victims. This court has recognized the potential psychological, as well as physical, harm of

our view, comparing the statutory sentence of six years and three months in prison to the "gravity" of the touching for which defendants were convicted suggests, preliminarily, that that penalty is not "proportioned" to their offenses as required by Article I, section 16.

That view is strengthened when we compare defendants' conduct with other conduct that ORS 163.427 explicitly brings within its scope and that also may be prosecuted as first-degree sexual abuse. First, the text of the statute penalizes, to the same extent as the conduct at issue here, the following conduct:

> "Intentionally caus[ing] a person under 18 years of age to touch or contact the mouth, anus or sex organs of an animal for the purpose of arousing or gratifying the sexual desire of a person."

ORS 163.427(1)(b). Reasonable people—one is tempted to say, *all* reasonable people—would agree that the conduct in which defendants engaged here is far less severe, wrongful, immoral, or harmful to a victim than at least one other form of first-degree sexual abuse—intentionally causing a person under 18 to engage in bestiality. ORS 163.427 also makes sexual contact first-degree sexual abuse if it is the result of "forcible compulsion" by the wrongdoer, regardless of the age of the victim, ORS 163.427(1)(a)(B), such as by violence towards a victim, armed threats to accomplish sexual contact, or ripping off the victim's clothes to make sexual contact. Again, the difference between such conduct—punished by the same mandatory 75-month sentence that Measure 11 would impose here—and defendants' conduct is obvious to any reasonable person.

Second, when one examines the conduct here compared not just to other conduct specifically described in ORS 163.427 but to the range of possible conduct encompassed by the subsection of the statute applied here—sexual contact with a person under 14—the idea that the same six-year and

---

sexual abuse. *Wheeler*, 343 Or at 679-80; *see also State v. Stoneman*, 323 Or 536, 546-48, 920 P2d 535 (1996) (describing harm to children from crime of purchasing child pornography). However, in considering the relative seriousness of the criminal conduct that comes within the statutory definition of first-degree sexual abuse, the conduct here, which was limited in the ways described above and involved no physical harm, is far towards the less serious end of the spectrum.

three-month sentence should be applied becomes even more untenable. We have reviewed all the reported first-degree sexual abuse cases decided since the effective date of the 75-month mandatory sentence, and, although not all opinions discuss the defendants' conduct in detail and many involve convictions of other sex crimes as well, we are unable to find any case in which the contact upon which the convictions were based was as limited as in these cases. More typical are cases like *State v. Foreman*, 212 Or App 109, 157 P3d 228 (2007), where the defendant was convicted of first-degree sexual abuse for engaging in sexual contact with the three-year-old victim by touching her vagina with his hands and penis.[15] In another unfortunately typical first-degree sexual abuse case, the defendant repeatedly "rubbed his penis against" his six-year-old victim, including one occasion where he took her clothes off, laid her on the floor, and rubbed his penis "all over her." *State v. Reed*, 173 Or App 185, 21 P3d 137 (2001).

Even the other cases involving the least sustained or harmful conduct are easily distinguishable from the facts here. In *State v. Cockrell*, 174 Or App 442, 26 P3d 169 (2001), for example, the defendant was convicted of one count of first-degree sexual abuse when, while "roughhousing" with his 11-year-old niece, he picked her up and repeatedly "rubbed" her crotch area, rubbing that she described as persistent and deliberate. In *State v. Acker*, 175 Or App 145, 27 P3d 1071 (2001), the defendant furnished alcohol to his stepdaughter's 13-year-old friend and touched her breasts and buttocks. Those and other reported cases lend credence to the comments made by the experienced trial judges in the cases at issue here that neither had ever seen a first-degree sexual abuse case based on such minimal physical contact.

■■ ■■ The state consistently refers to the Measure 11 sentence for first-degree sexual abuse as a "mandatory *minimum* sentence," suggesting that a trial court could impose a *greater* sentence for the crime if the facts were more egregious than they are in these cases, thus alleviating any proportionality concerns. That is incorrect. The sentencing

---

[15] The defendant was also convicted of first-degree sodomy for putting his penis in the victim's mouth.

guidelines permit a trial court to depart from a presumptive sentence and "to impose a sentence which is proportionate to the seriousness of the crime of conviction and the offender's criminal history." OAR 213-008-0003(1). However, an upward durational departure "shall not total more than double the maximum duration of the presumptive prison term." OAR 213-008-0003(2). The presumptive sentence for first-degree sexual abuse—absent Measure 11—is 16 to 18 months in prison. Because no other statute authorizes the trial court to impose a greater sentence than the mandatory 75 months set by Measure 11, that sentence becomes the minimum *and* the maximum sentence for first-degree sexual abuse.[16] Moreover, as with other Measure 11 sentences, the trial court has no authority to *reduce* a sentence for first-degree sexual abuse. In other words, with a narrow exception not available to these defendants, *see* 347 Or at 68 n 11, exactly the same sentence is imposed whether the conduct is as limited as it is in these cases or as extensive and gruesome as the examples suggested by defendants or as described in other reported first-degree sexual abuse cases, discussed above.

Finally, although we recognize the legislature's authority to change sentences for crimes, proportionality review under the Oregon Constitution certainly can take into consideration the historical fact that, before Measure 11, the sentencing guidelines established, as the presumptive sentence for first-degree sexual abuse, a prison term of 16 to 18 months. As noted, even if the trial court had imposed the maximum upward departure from the presumptive guidelines sentence, based on aggravating circumstances, the maximum sentence for first-degree sexual abuse for a defendant with no prior convictions would have been 36 months. Measure 11 imposed a mandatory sentence on these defendants that is more than twice as long as the *maximum* sentence that could have been imposed on these defendants

---

[16] If a person convicted of a felony sex offense, such as first-degree sexual abuse, already has *two* previous felony sex abuse convictions, ORS 137.719(1) provides a presumptive sentence of life in prison. Even that recidivism statute, however, which this court upheld in *Wheeler*, permits the court to impose a lesser sentence upon making certain findings. ORS 137.719(2) (authorizing a "departure" sentence from the "presumptive" sentence).

under the guidelines. Although the 75-month sentence is not disproportionate for most of the conduct that constitutes first-degree sexual abuse, the previously applicable guidelines sentence supports the conclusion that the 75-month sentence is disproportionate for the conduct at issue here.

For the reasons described above, a comparison of the penalty and the offense indicates that the 75-month Measure 11 sentence may be so disproportionate to defendants' offenses as to violate Article I, section 16. Not only does defendants' criminal conduct appear insufficiently grave to justify the mandatory six-year and three-month sentence, but it also is less severe than the conduct in the vast majority of (and probably in all) other reported first-degree sexual abuse cases since Measure 11 was passed.

Despite our initial view that the penalty that Measure 11 would impose for defendants' offenses may be unconstitutionally disproportionate, one could imagine a regime of draconian penalties for a wide variety of criminal offenses in which a 75-month sentence for the conduct at issue here would not "shock the moral sense," because more serious crimes routinely were punished even more severely. Accordingly, we continue our inquiry by considering the penalty that Measure 11 would impose here in the context of the penalties imposed for related crimes.

### 2. *The Penalties for Related Offenses*

As discussed above, courts are ill-equipped to conduct an open-ended inquiry comparing the gravity of disparate crimes as part of a determination of whether the penalty for one of the crimes is disproportionate. Courts are, however, able to reach at least general conclusions about whether some related crimes are more serious than others. Defendants point out that the careful calibration of lesser and greater sex crimes from the 1971 criminal code revision, with corresponding gradations in punishment, was undone by later changes to the definitions of the substantive crimes and, in 1995, by the imposition of Measure 11 sentences for many of those crimes. The legislature, of course, can and routinely does change the criminal code and the penalties for various crimes. Nevertheless, to the extent that the structure of related sex crime statutes reflects the kinds of considerations

that lead reasonable people to conclude that one crime is more serious than another, it is relevant to our consideration of proportionality.

Two aspects of Oregon's penalties for sex crimes, when compared to the 75-month sentences that Measure 11 would impose on defendants here, raise proportionality concerns. First, as discussed above, the conduct in these cases is at the outer edge of "sexual contact" as that term is defined in ORS 163.305(6)—it involved, in one case, the back of the child's head and the clothed breasts of Rodriguez, and, in the other, the child's clothed buttocks and Buck's hand. The contact was momentary; there was no fondling or stimulation. Yet conviction for the sexual contact in these cases results in the *same* sentence as would be imposed on a defendant who anally sodomized the boy whom Rodriguez touched or the girl whom Buck touched. *See* ORS 163.395 (defining second-degree sodomy); ORS 137.700(2)(a)(M) (mandatory 75-month prison sentence for second-degree sodomy). And Rodriguez and Buck would have received the *same* sentences if they had engaged in sexual intercourse with the children that they briefly touched. *See* ORS 163.365 (defining second-degree rape); ORS 137.700(2)(a)(K) (mandatory 75-month sentence for second-degree rape). They would have received the *same* sentences if they had "penetrate[d] the vagina, anus or penis [of children under the age of 14] with any object other than the penis or mouth." *See* ORS 163.411 (defining second-degree sexual penetration); ORS 137.700(2)(a)(O) (mandatory 75-month sentence for second-degree sexual penetration).

We can assume that a reasonable person would consider the mandatory 75-month sentences for the conduct just described—constituting second-degree sodomy, second-degree rape, and second-degree sexual penetration—as proportioned to those offenses. And, we may also assume that a reasonable person would conclude that a 75-month penalty for a defendant who committed first-degree sex abuse by stripping a six-year-old girl, laying her on the kitchen floor, and "rubb[ing] his penis all over her," *see Reed*, 173 Or App at 188, was proportioned to the offense. In our view, however, that same reasonable person could not, at the same time, conclude that the mandatory 75-month sentence for the conduct

at issue here also is proportioned to the offense, whether the conduct comes within the statutory definition of first-degree sexual abuse or any other criminal statute.

Another enlightening comparison, for proportionality purposes, is that between the offense and punishment in these cases and the offense of *second*-degree sexual abuse and the penalty for that offense. ORS 163.425 defines second-degree sexual abuse as:

> "subject[ing] another person to sexual intercourse, deviate sexual intercourse or * * * penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor and the victim does not consent thereto."

Second-degree sexual abuse has occurred, for example, when the defendant touched the victim's vagina and "penetrat[ed] the victim's anus with his fingers," *State v. Liviu*, 209 Or App 249, 251, 147 P3d 371 (2006), and where the defendant (a nurse in a psychiatric hospital) stood next to the bed of a bipolar, sedated patient with his pants open and an erect penis and indicated that he wanted the patient to perform oral sex on him, and the patient complied, *State v. Neubauer*, 214 Or App 130, 162 P3d 1044 (2007).

That conduct, both in its physical and sexual content, invasion of the body of the victim, and likely psychological impact, seems far removed from the touchings at issue here, even when the victim is older than 18. Yet, a person convicted of second-degree sexual abuse will not receive a Measure 11 sentence. Rather, if that person has no prior convictions, he or she will receive a guidelines sentence, presumptively of 90 days in jail and 90 days under some other form of custodial supervision. OAR 213-005-0011(2)(c); OAR 213-005-0013(1)(c). Here, in other words, is a sex crime that is closely related in terms of severity and description to first-degree sexual abuse and which, in practice, often is based on conduct that most people would consider far more serious than the conduct of Rodriguez and Buck. Nonetheless, the penalty for that crime is a fraction—incarceration for one twenty-fifth the time—of the penalty that Measure 11 would impose here. It is another indication that Measure 11 sentences in these cases would be disproportionate to the offense.

### 3. Criminal History

The third factor on which this court's prior cases often focus in determining whether a penalty is proportioned to the offense is the defendant's criminal history. That inquiry is relevant, as discussed above, because a defendant who previously has been convicted of and served sentences for other crimes has demonstrated, by committing additional crimes, that the previously imposed sentences were insufficient to prevent the defendant from returning to his or her criminal behavior. *See Smith,* 128 Or at 525 (substantial penalties for recidivists permissible, because state may "rid itself of depravity when its efforts to reform have failed"). As this court noted in *Wheeler,* a sentence that is proportioned to an offense committed by a repeat offender might not be proportioned to the offense if committed by a person with no criminal history. 343 Or at 672-73.

In contrast to repeat-offender statutes, and in contrast to the sentencing guidelines, in which criminal history plays a major role, Measure 11's mandatory 75-month sentence for first-degree sexual abuse applies even if the defendant has had no prior criminal charges, arrests, or reported police contact—as in these cases.[17]

The legislature may impose mandatory sentences for those who commit certain crimes, despite the fact that such sentences eliminate any consideration of the defendant's criminal history. However, the issue here is whether imposing *these particular mandatory sentences on these defendants* violates their constitutional right under Article I, section 16, to sentences that are proportioned to the offenses that they committed.

As we have noted above—and as the trial judge in each case emphasized in holding the 75-month mandatory sentence unconstitutional as applied to these facts—neither

---

[17] Indeed, a defendant who had been convicted of "penetrat[ing] the vagina, anus or penis [of a child the age of the victims here] with any object other than the penis or mouth," ORS 163.408, and who later was convicted a *second* time of engaging in the same conduct with a child the same age would receive, for that second conviction, the *same* sentence imposed on Rodriguez and Buck. Only if that recidivist committed a third felony sex offense would a longer sentence—such as the presumptive life sentence prescribed by ORS 137.719(1)—be imposed.

defendant has any prior convictions. Under the sentencing guidelines, and in the absence of Measure 11, the presumptive sentence for a person convicted of first-degree sexual abuse would be 16 to 18 months in prison. Even if the person had a serious criminal record—*three or more person felonies*—the presumptive sentence under the guidelines would have been only 41 to 45 months in prison. Moreover, defendants here not only had no prior convictions or charges of any kind, but, in each case, the brief touching occurred on a single occasion.[18] In the more common first-degree sexual abuse cases (at least those that have resulted in reported opinions), the contact is not only far more physically invasive and sexually charged, but it has occurred multiple times, rather than only once. In *State v. Sullivan,* 217 Or App 208, 174 P3d 1095 (2007), for example, where the defendant was convicted of two counts of first-degree sexual abuse, the victim testified that the defendant had abused her over a four-year period. Similarly, in *State v. Rhodes,* 149 Or App 118, 941 P2d 1072 (1997), the 15-year-old defendant was charged with one count of first-degree sexual abuse for touching his nine-year-old sister's vagina beneath her clothes on more than 20 separate occasions.

 Traditional understandings of proportionality, as well as this court's cases, require us to consider whether a defendant is a repeat offender by considering previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct. Here, the absence of any criminal convictions and the single occurrence of the wrongful conduct support the conclusion that a 75-month sentence is unconstitutionally disproportionate to the offenses committed by these defendants.

## IV. CONCLUSION

In summary, this court's cases establish that a criminal penalty is unconstitutionally disproportionate to the offense, in violation of Article I, section 16, when imposition of the penalty would "shock the moral sense" of reasonable people. In applying that standard, this court first examines

---

[18] Rodriguez was charged with unlawfully touching the boy on another occasion, but the jury deadlocked on that charge.

the relationship between the severity of the penalty and the gravity of the offense, including consideration of the particular conduct of the defendant that constituted the offense. We also consider the penalties imposed for other crimes and the defendant's criminal history. Those considerations lead us, for the reasons described above, to conclude that these cases present the rare circumstance in which the statutorily prescribed penalty is so disproportionate to the offenses committed by these defendants that it "shocks the moral sense" of reasonable people. Accordingly, 75-month sentences, as applied to defendants here, would violate Article I, section 16, of the Oregon Constitution.[19]

 We recognize the authority of the people, acting through the initiative process, to exercise their legislative power and establish policy for the state by setting mandatory minimum sentences for certain crimes. *See Ferman-Velasco,* 333 Or at 425-32 (rejecting facial challenges that Measure 11 sentences violated Oregon Constitution); *Huddleston,* 324 Or at 609-17 (same). However, the Oregon Constitution represents the fundamental expression of the people regarding the limits on governmental power. And it is the obligation of the courts to ensure that those fundamental principles are followed. We recently held another statute unconstitutional because, as applied to the facts of that case, the statute was inconsistent with Article I, section 10, of the Oregon Constitution—a provision that protects a person's right to a "remedy" for an injury to person, property, or reputation. In doing so, we stated that the right to a remedy protected by that constitutional provision was "not merely an aspirational statement, but was intended by the framers * * * to preserve [that right] for future generations, against legislative or other encroachment." *Clarke v. OHSU,* 343 Or 581, 606, 175 P3d 418 (2007).

---

[19] The state's position is that the 75-month term is constitutional. It makes no alternative argument that, even if a 75-month sentence would violate Article I, section 16, any prison term *less* than 75 months would be constitutional. For that reason, we do not need to consider whether some sentence greater than the 16 months imposed on Rodriguez or the 17 months imposed on Buck—but less than the 75-month mandatory sentence—would pass constitutional muster. The state raised no other objections to the trial court rulings. Moreover, although Rodriguez and Buck both appealed their convictions—appeals that we rejected, for reasons previously discussed—neither argued that the sentence imposed by the trial court was excessive. Thus, we need not consider whether the sentences imposed by the trial courts were constitutionally permissible.

Like the right to a remedy in Article I, section 10, the proportionality requirement of Article I, section 16, is not merely aspirational, but was intended to protect Oregon's citizens against penalties that are disproportionate to their offenses.

■ These cases are like *Clarke* in another respect, because they illustrate the specific, limited circumstances in which we may conclude that a statute that is constitutional on its face nevertheless may be unconstitutional as applied to particular facts. In *Clarke*, we recognized that a legislatively imposed limit on injury claims against the state did not, on its face, violate Article I, section 10. 343 Or at 604-05. However, considering the facts of that case, where the plaintiff's actual damages exceeded $11 million, and the legislature had imposed a cap of $200,000, we held that application of the legislative cap to that plaintiff was unconstitutional. Similarly, this court has rejected broad arguments that Measure 11 sentences, on their face, are disproportionate, and we have routinely upheld such sentences against constitutional challenge. *See, e.g., Ferman-Velasco,* 333 Or at 425-32 (rejecting facial challenge). But, as in *Clarke,* when the facts of a particular case demonstrate that the application of the statute to those unique facts would be unconstitutional, it is the obligation of this court to enforce the constitutional provision— our fundamental law—rather than the statute.

The trial court in each case correctly held that the 75-month mandatory sentence would violate Article I, section 16, and imposed a lesser sentence. The Court of Appeals erred in concluding otherwise and reversing the sentences. However, the Court of Appeals correctly concluded that there was sufficient evidence to support defendants' convictions. We therefore affirm the judgments of conviction and the sentences imposed by the trial courts.

The decisions of the Court of Appeals are affirmed in part and reversed in part. The judgments of the circuit courts are affirmed.

**DE MUNIZ, C. J.,** concurring in part and dissenting in part:

In both cases before the court, defendants were convicted of first-degree sexual abuse based on sexual contact

with victims less than 14 years of age, in violation of ORS 163.427. Because I agree that there was sufficient evidence in the record to support defendants' convictions for first-degree sexual abuse, I concur with the majority's affirmance of those convictions.

However, I must dissent from the majority's affirmance of the sentences imposed by the trial court in each case. In my view, the trial court's failure to impose the sentences mandated by Measure 11 was error. I would summarize my position this way: The legislature (and, here, the people exercising their legislative power through the initiative process) reasonably could conclude that children need particular, special, and vigorous protection from those who would prey upon them. The legislature further reasonably could conclude that, of all the harms (short of murder) done to children, sexual harm has by far the greatest potential for creating long-lasting psychological damage to the victims. The legislature further reasonably could conclude that, in light of the foregoing, it wished to create a "zero tolerance" policy toward offenders who sexually molested members of this protected group. In my view, that is precisely what the legislature has chosen to do here, and it is no office of ours to second-guess that choice.

In affirming the trial courts' sentences, the majority interprets Article I, section 16, in a way that allows the judiciary to encroach on the authority of the legislature to determine the appropriate penalties for crimes. Although the contours of the test for proportionality had not been precisely drawn previously, this court's cases have demonstrated three overarching principles: (1) the legislature has broad authority to define crimes and to establish penalties based on its considered judgment regarding the seriousness of those crimes; (2) only a sentence that is grossly disproportionate compared to the offense is forbidden by Article I, section 16; and (3) a sentence is so disproportionately severe so as to violate Article I, section 16, in only rare and extreme circumstances.

In 1929, this court stated that the "power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power[.]" *State v.*

*Smith,* 128 Or 515, 524, 273 P 323 (1929). In *Jensen v. Gladden,* 231 Or 141, 146, 372 P2d 183 (1962), the court reiterated that "[i]t is the province of the legislature to establish the penalties for the violation of various criminal statutes * * *." Recently, in an opinion rejecting an as-applied challenge to a Measure 11 sentence, this court stated that "the legislature (and the people, acting through the initiative process) has broad authority to determine which crimes [are] 'greater' and therefore deserving of greater penalties, *as long as there is some reasonable basis for that decision*[.]" *State v. Wheeler,* 343 Or 652, 672, 175 P3d 438 (2007) (emphasis added).

*Wheeler* also emphasized that "the legislature's authority to set criminal penalties means that the court's role is a limited one," *id.,* and that the court's test for evaluating Article I, section 16, "attempt[s] to articulate a standard that would find a penalty to be disproportionately severe for a particular offense only in *rare* circumstances," *id.* at 670 (emphasis added). The limited nature of the court's role is demonstrated by how infrequently the court has sustained challenges to sentences under Article I, section 16. On two occasions, this court has held that a sentence violated Article I, section 16, when the lesser-included offense was punished more severely than the greater offense. *State v. Shumway,* 291 Or 153, 164, 630 P2d 796 (1981) (lower minimum sentence for aggravated homicide than for unaggravated homicide violated Article I, section 16); *Cannon v. Gladden,* 203 Or 629, 633, 281 P2d 233 (1955) (maximum of life imprisonment for assault with intent to commit rape violated Article I, section 16, when rape carried a maximum sentence of 20 years). This is not one of those cases.

This court has only once invalidated a sentence as "excessive" in an as-applied challenge. In *State v. Ross,* 55 Or 450, 474, 104 P 596 (1909), *on reh'g,* 106 P 1022 (1910), a defendant convicted of larceny was fined more than $500,000 and sentenced to five years and additional time until the fine was paid, not exceeding 288,426 days (more than 790 years). The court concluded that the 288,426-day sentence was "cruel and unusual within the prohibition of the constitution." *Id.* In doing so, the court noted that

"[t]here can be no question that a sentence may be excessive, even though within the maximum of the statute, but if excessive, it is within the power of the appellate court to enforce this provision of the Bill of Rights, and avoid the judgment so far as it is excessive."

*Id.* at 474. On a motion for rehearing, the court also eliminated the fine, concluding that

"[t]he fine and the imprisonment for nonpayment thereof, adjudicated by the trial court, were within the terms of the statute and in compliance with its direct command, but we are of the opinion that, the fine being so great, it is apparently beyond the power of the defendant to pay it at this time or even during a lifetime of effort, and is such a one as is inhibited by the constitution."

*Id.* at 480.

Sentencing an adult who was convicted of sexual contact with a child under the age of 14—even if that contact would be deemed "minimal" by most—to six years and three months does not approach the level of disproportionality seen in Ross, where a person convicted of larceny received a sentence of approximately 790 years. In my view, a sentence of six years and three months for any sexual contact with a child represents a permissible legislative choice. Western society has long criminalized sex with children. Ancient Roman law was among the first to specifically forbid sexual contact with children:

" 'The law imposed capital punishment upon those who 'ravished a boy or a woman or anyone through force.' Successful seduction of minors, when accomplished by persuasion and blandishments, rather than by crude force, was also punishable by death, while an unsuccessful attempt to seduce a minor merited the milder penalty of exile.' "

Charles A. Phipps, *Children, Adults, Sex and the Criminal Law: In Search of Reason*, 22 Seton Hall Legis J 1, 7 (1997) (quoting James A. Brundage, *Law, Sex, and Christian Society in Medieval Europe* 47 (1987). English law included sexual crimes against children as early as the thirteenth century. Phipps, 22 Seton Hall Legis J at 8. American law followed suit, with sexual penetration crimes involving children well established by the early nineteenth century. *Id.* at 12.

Oregon's first criminal code criminalized "carnal knowledge" of children under the age of 14:

> "If any person shall carnally know any female child, under the age of fourteen years, or shall forcibly ravish any woman of the age of fourteen years or upwards, such person shall be deemed guilty of rape, and upon conviction thereof, shall be punished by imprisonment * * * not less than three, not more than twenty years."

*General Laws of Oregon*, Crim Code, ch 43, § 521, p 530 (Deady 1845-1864). Oregon raised the age of consent to 16 in 1895, but the punishment range remained between three and 20 years' imprisonment. *The Codes and Statutes of Oregon*, title XIX, ch II, § 1760 (Belliner & Cotton 1901); *see also Oregon Laws*, title XIX, ch II, § 1912 (1920) (same). The rape statute remained essentially unchanged until 1953, when the legislature enacted the Oregon Revised Statutes. ORS 163.210 (1953) provided:

> "(1) Any person over the age of 16 years who carnally knows any female child under the age of 16 years * * * is guilty of rape, and shall be punished upon conviction by imprisonment * * * for not more than 20 years.
>
> "(2) Proof of actual penetration into the body is sufficient to sustain an indictment for rape."

In 1970, the Criminal Law Revision Commission undertook a large scale revision of Oregon's criminal statutes, including the statutes governing sexual offenses. The Commission proposed a new crime, sexual abuse, which was "intended to cover all unconsented acts of sexual conduct which do not involve the element of genital penetration." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code §§ 115 & 116, 122 (July 1970). The Commission also explained,

> "Under the common law such conduct would have constituted an assault. Most state laws do not differentiate sexual from other assaults, except assaults with intent to rape or commit sodomy. Assault as defined in the draft requires the infliction of actual physical injury. It is contemplated that in many instances the conduct dealt with in sexual abuse

sections would not result in physical injury and, therefore, would not be covered by the assault article."

*Id.*

The Commission drafted two statutory sections that defined two degrees of sexual abuse. The Commission defined first-degree sexual abuse as follows:

"(1) A person commits the crime of sexual abuse in the first degree when he subjects another person to sexual contact; and

"(a) The victim is less than 12 years of age; or

"(b) The victim is subjected to forcible compulsion by the actor."

*Id.* § 116(1), 122. The proposed statute governing second-degree sexual abuse provided, in part:

"(1) A person commits the crime of sexual abuse in the second degree if he subjects another person to sexual contact; and

"(a) The victim does not consent to the sexual contact; or

"(b) The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless."

*Id.* § 115(1), 121. The Commission defined "sexual contact" as "any touching of the sexual or other intimate parts of a person * * * for the purpose of arousing or gratifying the sexual desire of either party." *Id.* § 104, 104. The Commission explained that "[t]he inclusion of the words 'or other intimate parts' does not limit the touching to genitalia but is intended to include genitalia, breasts and whatever anatomical areas the trier of fact deems 'intimate' in the particular cases which arise." *Id.* §§ 115 & 116, 122.

The legislature codified those sections as ORS 163.425 (first-degree sexual abuse), ORS 163.415 (second-degree sexual abuse), and ORS 163.305(7) (definition of "sexual contact") in 1971. First-degree sexual abuse was classified as a Class C felony, which carried a maximum penalty of five years' imprisonment. ORS 161.605 (1971).

The sexual abuse statutes were revised in 1991. Or Laws 1991, ch 830. First-degree sexual abuse was amended to raise the age of the victim from less than 12 years old to less than 14 years old. *Id.* § 3; ORS 163.427 (1991). First-degree sexual abuse was also redesignated a Class B felony, which carried a maximum penalty of ten years' imprisonment. Or Laws 1991, ch 830, § 3; ORS 161.605(2) (1991). These changes to the first-degree sexual abuse statute reflect the legislature's permissible choice to encompass more conduct within the first-degree sexual abuse statute and to punish that conduct more severely.

Felony sentencing in Oregon also changed during this time. Just prior to the changes in the sexual abuse statutes, the Oregon Felony Sentencing Guidelines, effective in 1989, reduced the trial court's discretion in sentencing by establishing presumptive sentences based on the seriousness of the crime and on the defendant's criminal history. *State v. Davis*, 315 Or 484, 486-87, 847 P2d 834 (1993). The sentencing guidelines include a 99-block "Sentencing Guidelines Grid" to use in determining a presumptive sentence. On the grid, the court first locates the appropriate category of the crime of conviction on the Crime Seriousness Scale on the vertical axis of the grid, then locates the appropriate category for the convicted offender on the Criminal History Scale on the horizontal axis of the grid, and, finally, locates the grid block where the two categories intersect. *Id.* at 487. Within that grid block is the presumptive sentence in the form of a range of months of imprisonment or a term of probation. *State v. Ferman-Velasco*, 333 Or 422, 426, 41 P3d 404 (2002). Under the sentencing guidelines, a person with no criminal history convicted of first-degree sexual abuse would receive a sentence of 16-18 months' imprisonment.

In 1994, the voters of Oregon chose, by adopting Measure 11, to curtail further the ability of the judicial branch to fashion sentences. The sentencing policy embodied in Measure 11 requires that all offenders guilty of criminal conduct subject to Measure 11 receive a *mandatory* minimum sentence, regardless of the circumstances of the crime, the victim, or the offender. As this court has explained in its previous cases, that policy choice, on its face, does not offend the Oregon Constitution. *See, e.g., State ex rel Huddleston v.*

*Sawyer*, 324 Or 597, 609-17, 932 P2d 1145 (1997) (rejecting various state constitutional challenges to Measure 11). The court left open the possibility, however, of as-applied constitutional challenges to Measure 11. *Id.* at 612. With regard to the cases now before us, I disagree with the majority's methodology in assessing the as-applied challenges asserted in these cases as well as its ultimate conclusion that the Measure 11 sentences applied in these cases would violate Article I, section 16.

The majority's test for whether a punishment shocks the moral sense of all reasonable people so as to violate Article I, section 16, includes an analysis of "at least three factors": (1) a comparison of the severity of the penalty and the gravity of the offense; (2) a comparison of the penalties imposed for other crimes; and (3) the criminal history of the defendant. 347 Or at 58. In my view, the only relevant factor is the first, which simply sets forth the two things that must be compared to determine whether a punishment is "proportioned" to the offense. *See Wheeler*, 343 Or at 655-56 (explaining that "proportioned" indicates a comparison between the penalty and the offense). Even as to that factor, however, I do not agree with any approach that places this court in the position of factfinder. Our role as an appellate court does not extend to applying our own characterizations about the defendant or the victim as a basis for answering the constitutional question before us.

My application of the first factor brings me to a different result from that of the majority. I agree with the majority's statement outlining the applicable penalty: a mandatory sentence of 75 months'—six years and three months'—imprisonment, which, under Measure 11, may not be reduced by the trial court because of mitigating factors. I also agree that the applicable offense in each case is the conduct that led to the defendants' convictions for first-degree sexual abuse. Where I disagree is in the majority's characterization of that conduct—the "limited extent of the offenses." 347 Or at 70. It is undisputed that both defendants were adults significantly older than their child victims, who were both less than 14 years old. It is undisputed that both defendants were entrusted with the care of their child victims. Defendant Buck's conduct consisted of his hand touching his

victim's clothed buttocks at least two times. Defendant Rodriguez's conduct consisted of touching the back of her victim's head with her clothed breasts in the presence of several witnesses.

The majority focuses on the fact that there is no evidence of physical injury or harm in these cases. Neither is there evidence that the victim suffered *no* injury, because the statutes defining the crime, ORS 163.427(1)(a)(A) and ORS 163.305(6), do not require the state to prove that the victim suffered any particular harm. Nor is the lack of harm a defense to the crime. Determining whether or not the victim suffered harm is exactly the kind of determination that this appellate court is ill-equipped to make. The court should not rely on conjecture or its own characterization of facts that have not been found by the factfinder below. For example, what if the victims here had been nine years old instead of 12 and 13 years old? Would that change our Article I, section 16, analysis? If so, based on what? The court is ill-equipped to assess the gravity of harm suffered by the child victims in these cases based on the court's own opinions of the facts and the gravity of the case.

Moreover, as this court recognized in *Wheeler*, 343 Or at 679-80, "[s]ex crimes may or may not result in permanent physical injury, but the legislature is entitled to presume that they are a serious matter in light of the *potential* for both physical and psychological injury * * *." (Emphasis added.) The legislature has determined that a child cannot consent to a sexual act in any circumstances, including those circumstances that do not include evidence of harm. *See* ORS 163.315(1)(a) ("A person is considered incapable of consenting to a sexual act if the person is * * * [u]nder 18 years of age[.]"). It cannot be disputed that the legislature was entitled to make that determination.

The majority also focuses on the breadth of the conduct encompassed by the first-degree sexual abuse statute, apparently accepting defendants' argument that, "when a criminal statute is extremely broad and the conduct in a particular case is at the margins of the offense," a court should consider whether that conduct is less grave and less deserving of the same punishment than is conduct at the heart of

the offense. For example, defendants contrast their conduct—pressing victim's head against a woman's clothed breasts or touching victim's clothed buttocks—with prolonged hand-to-genital contact or with forcing a child to engage in bestiality. The majority endorses a similar comparison, and states that,

> "[r]easonable people—one is tempted to say, all reasonable people—would agree that the conduct in which defendants engaged here is far less severe, wrongful, immoral, or harmful to a victim than at least one other form of first-degree sexual abuse—intentionally causing a person under 18 to engage in bestiality."

347 Or at 71. Even though that may be true, it is just as reasonable for the legislature to conclude that *any* sexual contact with a child under 14 years of age is a serious crime warranting a minimum prison sentence in every case. Reasonable minds may also agree that the legislature—or the people exercising the initiative power—erred in judgment, not when it included the conduct at issue in this case within a crime that is subject to a 75-month mandatory sentence, but when it failed to impose a sentence for bestiality or other more "grave" sexual contact with children that was greater than 75 months. When the legislature chooses between reasonable options, this court should not second-guess that choice, even if, as a policy matter, the court disagrees with the choice.

In my view, the legislature is entitled to presume that all acts committed against children "for the purpose of arousing or gratifying the sexual desire of either party," as occurred here, are serious offenses in light of the potential for both physical and psychological injury. Even if the conduct in both cases was less grave than many other reported first-degree sexual abuse cases, I emphasize that the factfinder in each case determined beyond a reasonable doubt that *defendants acted with a sexual purpose when they touched their victims.* When a child is subjected to intimate touching for a sexual purpose, even if the touching is not prolonged or occurs through clothing, that child is violated in a very specific manner. The legislature—or the people exercising their law-making authority through the initiative process—reasonably may determine that such behavior is sufficiently

serious that it should be punishable through mandatory minimum sentencing. A sentence of just over six years for sexual contact with a child less than 14 years of age is not the type of shockingly disproportionate penalty that Article I, section 16, prohibits. In fact, it is even less shocking than sentences that this court has upheld in the face of Article I, section 16, challenges. *See, e.g., State v. Teague*, 215 Or 609, 611, 336 P2d 338 (1959) (a 12-year sentence for forgery did not violate Article I, section 16). This case is not one of those rare or extreme cases where the constitution requires the judiciary to take action. I agree with the majority that Article I, section 16, is "not merely an aspirational statement" and that Article I, section 16, does impose a limit on the severity of punishment. Where the legislature has overstepped its broad authority in determining punishments, it is the judiciary's duty under Article I, section 16, to step in. Here, the legislature has not overstepped its authority in mandating a sentence of six years and three months for a sexual offense involving children under 14 years of age. Therefore, the judiciary need not step in.

In addition to my disagreement with the majority's application of the first factor it lists as relevant to the Article I, section 16, inquiry, I take issue with the application of the second and third factors. Those factors stray from the comparison of the penalty and offense at issue in Article I, section 16, challenges and, instead, lead the court to second-guess the legislature's judgment. Comparing the penalty for first-degree sexual abuse with the penalties assigned to other crimes—even other sex offenses—oversteps the role of the judiciary. That is especially true, where, as the majority does here, the court offers its own opinion as to the policy decisions of the legislature in defining the crime and assigning the penalty. This case does not present a special circumstance, as in *Shumway* or *Cannon*, in which the law punished a lesser-included offense more harshly than the greater offense. In this case, we should not substitute our own assessment of a crime's seriousness for that of the legislature.[1]

---

[1] Again, I point out that, contrary to the majority's assertions, reasonable minds may disagree on whether the legislature made a bad policy decision in failing to sentence other sexual offenses, such as second-degree rape or second-degree

Similarly, reviewing a defendant's criminal history is beyond what is necessary to determine whether the penalty is proportioned to the offense. If courts start looking to facts outside the offense to determine whether Article I, section 16, has been violated, all manner of issues arise. How should a court decide what circumstances bear on the analysis? What if both defendants had a criminal history of theft or driving while under the influence of intoxicants? What if defendants had been arrested for but not convicted of prior sex offenses? How would those facts affect the analysis and the outcome? Opening up the proportionality inquiry to facts beyond the offense and the penalty will lead to inconsistent results.[2]

I note that the legislature has exercised its authority, under Article IV, section 33, of the Oregon Constitution, which the people adopted together with Measure 11 in 1994, to allow for departures from Measure 11 sentences for certain sex offenses, based on facts outside the definition of the offense itself.[3] In ORS 137.712, the legislature provided for downward departures for certain offenses in certain circumstances. That statute provides, in part:

> "(1)(a) Notwithstanding ORS 137.700 and 137.707, *when a person is convicted of * * * sexual abuse in the first degree* as defined in ORS 163.427(1)(a)(A) * * *, the court may impose a sentence according to the rules of the Oregon Criminal Justice Commission that is less than the minimum sentence that otherwise may be required by ORS 137.700 or 137.707 if the court, on the record at sentencing, makes the findings set forth in subsection (2) of this section and finds that a substantial and compelling reason under

---

sodomy, to a higher term of imprisonment than first-degree sexual abuse. That possible error in policy, however, does not violate Article I, section 16, which is reserved for the most grossly disproportionate penalties.

[2] I note that the three cases relied on by the majority for its consideration of the defendants' criminal history all involve challenges to recidivist statutes, where naturally an evaluation of criminal history would occur. *See Wheeler*, 343 Or at 654; *Jensen*, 231 Or at 143; *Smith*, 128 Or at 520.

[3] Article IV, section 33, of the Oregon Constitution, provides:

"Notwithstanding the provisions of section 25 of this Article, a two-thirds vote of all the members elected to each house shall be necessary to pass a bill that reduces a criminal sentence approved by the people under section 1 of this Article."

the rules of the Oregon Criminal Justice Commission justifies the lesser sentence.

"* * * * *

"(2) A conviction is subject to subsection (1) of this section only if the sentencing court finds on the record by a preponderance of the evidence:

"* * * * *

"(e) If the conviction is for rape in the second degree, sodomy in the second degree or sexual abuse in the first degree:

"(A) That the victim was at least 12 years of age, but under 14 years of age, at the time of the offense;

"(B) That the defendant does not have a prior conviction for a crime listed in subsection (4) of this section;

"(C) That the defendant has not been previously found to be within the jurisdiction of a juvenile court for an act that would have been a felony sexual offense if the act had been committed by an adult;

"(D) *That the defendant was no more than five years older than the victim at the time of the offense*;

"(E) That the offense did not involve sexual contact with any minor other than the victim; and

"(F) That the victim's lack of consent was due solely to incapacity to consent by reason of being under 18 years of age at the time of the offense."

(Emphasis added.) That statute demonstrates that, if the legislature had desired to create an exception for circumstances in which no evidence of physical, emotional, or psychological injury existed, in which the sexual contact was brief or minimal, or in which the defendant had no criminal history, it could have done so.

Although I and, indeed, many members of the judicial branch may prefer a more enlightened sentencing scheme that would permit courts to sentence an offender in accordance with evidence-based practices that, in each case, are more likely to reduce offender recidivism and further community safety than does a mandatory minimum sentencing scheme,[4] the voters, exercising their legislative authority

---

[4] *See, e.g.,* Michael A. Wolff and Paul J. De Muniz, *Mainstream Sentencing— The Urgent Need for Reform*, Judicature 1 (Jan-Feb 2009) (arguing the state and

through the initiative process, have mandated that certain crimes receive certain minimum punishments. Even though the guideline sentences that the trial courts imposed in each case at issue here perhaps were sufficient to serve the criminal justice goals of accountability, reformation, and community safety, those guidelines sentences were contrary to the sentencing law of this state. As this court stated in *Ferman-Velasco*, "[Measure 11] represents the most recent legislative enactment demonstrating the seriousness with which the legislative branch views Measure 11 crimes, including defendant's crimes." 333 Or at 431. The sentences required by Measure 11 in these cases were not grossly disproportionate to the offenses so as to violate Article I, section 16. I therefore dissent.

Gillette and Walters, JJ., join in this opinion.

federal courts should adopt evidence-based practices to sentence offenders based on concerns about public safety and public values).